CITY OF DENVER ET AL. *v.* KNOWLES.

1. CONSTITUTIONAL LAWS—TAXES AND ASSESSMENTS DEFINED.—The word "tax," as used in the constitution, refers to the ordinary public taxes and not to assessments for local improvements in cities and towns. *Palmer v. Way*, 6 Colo. 106, overruled.

2. POWER to MAKE LOCAL ASSESSMENT.—The power to make such local assessments is not an infringement upon the constitutional rule requiring all taxes to be uniform.

3. CONSTITUTIONALITY OF STATUTES.—A fundamental principle of construction requires those who seek to overthrow a statute on account of its repugnance to a constitutional provision, to show the unconstitutionality of the act beyond all reasonable doubt.

4. ASSESSMENT UPON THE BASIS OF FRONTAGE.—Assessments for local improvements upon the basis of frontage, where the lots abutting upon the improvement are of substantially equal depth, will be upheld where the same is not shown to be unfair.

*Error to District Court of Arapahoe County.*

THIS action was brought in the court below by John M. Knowles, defendant in error, to restrain plaintiffs in error, the city of Denver, *et al.*, from collecting an assessment levied by the city upon certain lots owned by the defendant in error. The assessment was levied in proportion to the frontage of the lots upon the improvement. It is for the costs of paving, constructing gutters, etc., on 16th street in said city. Plaintiffs in error by their answers sought to justify the assessment under the following provisions of the charter of the city of Denver :

" Whenever the owners of the majority of the lots abutting on a street or alley, or a section thereof, shall petition the city council for the paving or grading, either or both, or whenever the board of public works shall order the same and shall notify the city council, such paving or grading, either or both, shall be ordered by ordinance, and two thirds of the total expenses thereof, excluding intersection of streets and alleys, shall be assessed upon the property abutting upon the

same, and one third of such expense on such frontage, and all the expenses at street and alley intersection shall be borne by the city. After the passage of such ordinance the board of public works shall advertise for thirty consecutive days in some newspaper published in the city of Denver, for bids for the grading or paving, either or both, which may include curbing and storm sewers, with their necessary manholes, inlets and appurtenances specified in the ordinance, under specifications to be prescribed by the board of public works. After receiving such bids the city council may award a contract or contracts for such grading, paving, curbing, etc., or all, to the lowest responsible bidder. Every contract shall contain a clause to the effect that it is subject to the provisions of the city charter and the ordinance ordering such grading or paving, either or both; and that on ten days notice the work under said contract may, without cost or claim against the city, be suspended by the board of public works for substantial cause. Warrants in payment of two thirds of the total cost, including the incidentals and interest of the grading or paving, or both, along any property frontage, which may include curbing, storm sewers as above indicated, so ordered, shall be issued in the manner provided by ordinance, and shall be payable out of the moneys collected from the assessments upon the lots abutting upon such improvement; *Provided*, that such warrants may be made payable in equal annual instalments of not less than three nor more than five years, with interest thereon. The amount in payment of the one third of the total cost of such improvement to be borne by the city shall be in cash, and shall be payable as provided by ordinance. As soon as any paving or grading, or both, which may include curbing, storm sewers, etc., so ordered, is fully completed, the board of public works shall compute the whole cost thereof and report the same to the city council, and the city council shall assess two thirds of the total cost of such work as a special tax against all the lots so improved, and in proportion as the respective frontage of each lot bears to the frontage of all the lots so im-

proved, under such ordinance. * * * " Session Laws, 1889, p. 141.

In the answer the proceedings taken on the part of the city authorities were also set forth with much particularity. To this answer a demurrer was interposed. It stands admitted that the petition upon which the city council ordered the improvement conforms to the requirements of the statute in every particular, and that it is signed by the requisite number of lot owners ; in fact, it is not claimed that the city did not regularly proceed under the statute. The contention being that the statute itself is unconstitutional and void. The district court being of this opinion sustained the demurrer to the answer and entered judgment in favor of defendant in error and against the city.

Mr. F. A. WILLIAMS, Mr. JAMES H. BROWN, Mr. MILTON SMITH and Mr. G. W. WHITFORD, for plaintiffs in error.

Mr. JOSEPH N. BAXTER, for defendant in error.

CHIEF JUSTICE HAYT delivered the opinion of the court.

The provision invoked to defeat the statute under which the city was attempting to proceed in this case, is found in § 3 of art. 10 of our constitution and reads as follows :

" All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax and shall be levied and collected under general laws, which shall prescribe such regulations as shall secure a just valuation of all property, real and personal. * * * "

The next succeeding section is as follows :

" Sec. 7. The general assembly shall not impose taxes for the purposes of any county, city, town, or other municipal corporation, but may by law vest in the corporate authorities thereof respectively the power to assess and collect taxes for all purposes of such corporation.

The questions raised are two in number and may be stated as follows :

I. Does the uniformity clause of the constitution prohibit local assessments upon the abutting property, for street improvements?

II. Has the legislature authority to provide that the cost of such improvements shall be apportioned according to frontage?

These questions have been the fruitful source of litigation for many years, and the course of judicial decisions thereon has not always been uniform. It is claimed that the decision of the district court against the validity of the ordinance is in harmony with the views expressed by this court in the early case of *Palmer v. Way*, 6 Colo. 106, (1881,) and followed upon the principle of *stare decisis*, in the late case of *Wilson v. Chilcott*, 12 Colo. 600.

Turning to the case of *Palmer v. Way*, we find the contention there to have been with reference to an assessment for the cost of a sidewalk in front of certain lots. The assessment was upheld as properly within the police power of the city. This was the only determination necessary to support the judgment there the subject of attack. The court did, however, go beyond this in the opinion filed and say that special assessments against the abutting lots for street improvements were in violation of the constitutional rule requiring uniformity of taxation, and could not be upheld under the taxing power.

This decision was followed in *Wilson v. Chilcott, supra,* without question and without the examination that would otherwise have been given to it. And thus an opinion upon a matter not necessary to the determination of the case under consideration at the time has been accepted as the law in this state for ten years, upon the principle of *stare decisis*. During this time, however, except in the case of *Wilson v. Chilcott, supra,* the doctrine has not been expressly indorsed in any case.

The view announced in the opinion referred to is supported by strong considerations of expediency; it operates to protect small property holders against extravagant and unwise

action in the premises by municipal authorities. But such considerations cannot control the judicial construction of constitutional provisions where the meaning is plain. And we feel constrained by strong logical reasons, as well as by the overwhelming weight of authority, to say that the uniformity of taxation enjoined by the constitution does not prohibit the legislature from authorizing the levy of special assessments in cities and towns, for local improvements in the nature of benefits to the abutting property. All matters of hardship and expediency must be left for legislative cognizance and action.

In neither of these cases is the distinction between local assessments and taxes levied for the general purposes of revenue pointed out. That such distinction, in fact exists, is now recognized by an almost unbroken line of decisions and by the consensus of opinion of all text writers upon the subject: Local assessments are upheld upon the theory that the property against which the assessment is made is specially benefited by the improvement, while taxes refer more particularly to those burdens imposed for revenue. There is certainly reason for saying that the word "tax," when used in the constitution, refers to the ordinary public taxes, and not to the assessments for benefits in the nature of local improvements. While, therefore, the power to make such assessments is referable to the taxing power, it is held not to be an infringement upon the rule requiring all taxes to be uniform. In support of these views we cannot do better than quote from the text writers of acknowledged standing and ability, who may well be presumed to have given the subject that consideration which its importance demands.

Mr. Desty in his work on Taxation says:

"The law makes a plain distinction between the taxes which are burdens or charges imposed upon persons or property to raise money for public purposes and assessments for city and village improvements, which are not regarded as burdens, but as an equivalent or compensation for the en-

hanced value which the property of the person assessed has derived from the improvement." 1 Desty, Taxation, § 3.

Judge Cooley notes the same difference:

"Special assessments are a peculiar species of taxation, standing apart from the general burdens imposed for state and municipal purposes, and governed by principles that do not apply universally. The general levy of taxes is understood to exact contributions in return for the general benefits of government, and it promises nothing to the persons taxed, beyond what may be anticipated from an administration of the laws for individual protection and the general public good. Special assessments, on the other hand, are made upon the assumption that a portion of the community is to be specially and peculiarly benefited in the enhancement of the value of property peculiarly situated as regards a contemplated expenditure of public funds; and in addition to the general levy, they demand that special contributions, in consideration of the special benefit, shall be made by the persons receiving it." Cooley on Taxation, p. 606.

And it is recognized by Judge Elliott in his work entitled, " Roads and Streets."

"A distinction is made between local assessments and taxes levied for general revenue purposes. The question has been before the courts time and time again, and the almost unruffled current of judicial opinion is that an assessment for a local improvement is not a tax within the meaning of the constitutional provision requiring uniformity of taxation." Elliott, Roads and Streets, p. 370.

Of like effect are the following adjudicated cases selected from the many that have been cited by counsel: *Farrar v. St. Louis,* 80 Mo. 379; *Adams v. Lindell,* 5 Mo. Ap. 197; *Hammett v. Philadelphia,* 65 Pa. St. 146; *Commonwealth v. Woods,* 44 Pa. St. 113; *Emery v. San Francisco Gas Co.,* 28 Cala. 345; *Speer v. The Mayor,* 85 Ga. 49; *Hoyt v. East Saginaw,* 19 Mich. 45; *Cain v. Conn,* 85 N. C. 8; *State v. Warren Co.,* 17 Ohio St. 558; *Allen v. Galveston,* 51 Tex. 302; *Hale v. Kenosha,* 29 Wis. 599.

A reference to the constitutional provision invoked to defeat this assessment, and a comparison between it and the constitutions of Pennsylvania and Missouri will show that one, and probably both of these instruments were drawn upon by members of the constitutional convention which prepared our constitution.

" All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." Penna. Const. 1873.

" Taxes may be levied and collected for public purposes only. They shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and all taxes shall be levied and collected by general law." Const. of Mo. 1875.

These constitutional provisions are substantially the same as ours in respect to the requirement of uniformity, and the same is true of the constitution of the state of Georgia, adopted the year subsequent to the time of meeting of the constitutional convention in this state.   The court of last resort in each of these states has decided that the provision has no reference to the assessments for local improvements.   See cases cited *ante*.

Of the same tenor are many cases in which it has been held that provisions exempting certain property, such as cemeteries, churches and schools, from taxation, do not relieve such property from assessments for local improvements. These decisions proceed upon the theory that assessments for benefits are not included in the word " taxation " as used in the statutes, and are, therefore, directly in point in the present controversy. *Lima v. Cemetery Ass'n*, 42 Ohio St. 128; *First Presbyterian Church v. Ft. Wayne*, 36 Ind. 338; *Second Universalist Church v. Providence*, 6 R. I. 235; *State v. Newark*, 36 N. J. L. 478; Cooley on Taxation, 207.

Even at the time our constitution was framed the provision relied upon to defeat the present assessment had, by the strong current of legal decision, been declared to have

no reference to special assessments, and we must assume that it was adopted in the light of such construction. While this construction at first met with much opposition and has not yet been universally accepted, it has been so frequently decided that the uniformity enjoined by the constitution does not invalidate local assessments, that such must now be considered as firmly established by precedent.

To the argument that the power is liable to abuse, it may be answered that such objection exists against the exercise of all power, but this is no reason why authority should not be lodged somewhere. We must presume that the local authorities will exercise the power for the advancement of the public good and with moderation. Should this not be done the legislature has full power to correct abuses and this body is in turn answerable to the people.

Although cases may be found to support the views announced in *Palmer v. Way, supra,* such cases, neither by force of the reasoning advanced nor by reason of their number can be said to unsettle the strong current of authority to the contrary. A fundamental principle of construction requires those who seek to overthrow a statute on account of its repugnance to a constitutional provision to show the unconstitutionality of the act beyond all reasonable doubt. This has not been done in this case, and we must, therefore, hold the statute valid as to the objections raised against it. In so far as the former opinions of this court are in conflict with the views herein expressed, such opinions are modified.

In regard to the second proposition but little need be said, as assessments upon the basis of frontage, where the lots abutting for the improvement were of substantially equal depth, was recently upheld by this court. See opinion of Mr. Justice Elliott in *Pueblo v. Robinson,* 12 Colo. 593. No facts are pleaded showing or tending to show that the mode adopted in the present instance is unfair to appellant.

Different principles of apportionment have been adopted in different states and sometimes in the same states at different times. See *Emery v. San Francisco Co., supra.* In

some way the cost of the improvement should be assessed upon the property in proportion to the benefit received by it. Absolute equality, however, cannot be expected. The duty of determining the mode to be adopted is peculiarly within the province of the legislative department of the government. And where substantial equality has been provided for, the courts will not interfere.

By the act questioned, whenever paving or grading is ordered by the city authorities, one third of the entire expense of the improvement in front of the lots must be borne by the city, together with all the expenses at street and alley intersections, the adjacent property being charged with only two thirds ($\frac{2}{3}$) of the cost of grading or paving in front of the same, thus in proportion as the benefit was deemed a public one, the whole city is required to pay. The balance of the expense being made a charge upon the abutting property, receiving, as it does, a special benefit from the improvement. Probably no rule of apportionment that has yet been devised is fairer than the one provided by this statute, when the assessment is against urban property.

It has not only received the sanction of many law writers, but has been expressly upheld in the following, among other cases, in addition to those cited in *Pueblo v. Robinson, supra. Emery v. San Francisco Gas Co., supra; Sheley v. Detroit,* 45 Mich. 431; *Speer v. The Mayor, supra; Farrar v. St. Louis, supra; People ex rel. Crowell v. Lawrence,* 41 N. Y. 137; *Palmer v. Stumph,* 29 Ind. 329; *Baltimore v. Hopkins,* 56 Md. 1; Cooley on Taxation (2d ed.), 624, *et seq.;* 2 Desty, Taxation, 1263.

The judgment of the district court will be reversed and the cause remanded for further proceedings in accordance with the views herein expressed.

*Reversed.*

MR. JUSTICE ELLIOTT (dissenting):

The principles announced in the foregoing opinion are so broad and sweeping in their character, so far-reaching in their

consequences, and so liable to affect disastrously the rights of private property, under certain circumstances, that I cannot give them my unqualified approval. The subject of local taxation for public improvements has been so fully considered and discussed by learned jurists and law writers that an extended opinion on my part in the present case is unnecessary. I feel it to be a duty, however, to express my views plainly upon the principal questions considered by the court.

1. Is there in this state any constitutional restriction upon the power of taxation by local assessments for public improvements?

Section 3 of article 10 of our state constitution provides: "*All taxes* shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws, which shall prescribe such regulations as shall secure a just valuation for taxation for all property, real and personal."

In the opinion announced by the majority of the court it is held that the words, "all taxes," as used in section 3, "refer more particularly to those burdens imposed for revenue," and not to "assessments for benefits in the nature of public improvements"—that the taxing power may provide for local assessments *ad libitum*, thus overruling the former opinions of this court upon that subject.

It must be admitted that this departure is apparently sustained by many judicial decisions, as is shown in the learned opinion of our present Chief Justice. Nevertheless, I am impressed with the conviction that the words, "all taxes," at the beginning of section 3, were at the time of the adoption of the constitution intended by the framers of that instrument, and understood by the people who adopted it, to be broad and comprehensive enough to include any and all kinds of taxes and burdens which the taxing power of the state might levy or assess upon their property. This view is supported by many cogent reasons.

Unquestionably, the word "tax," when used without qualification, is a generic term, broad enough to include every

species of burden, charge or assessment which may be levied
by the government upon any and all property within its
jurisdiction.    When used in the plural and preceded by the
comprehensive adjective "all"—"all taxes"—there is little
room to doubt what meaning the common mind would as-
cribe to such a phrase.    Upon the subject of interpretation
of words employed in framing constitutions, the following
from the pen of Judge Story cannot be too highly commended:

     " In the first place, then, every word employed in the con-
stitution is to be expounded in its plain, obvious and common
sense meaning, unless the context furnished some ground to
control, qualify, or enlarge it.    Constitutions are not de-
signed for metaphysical or logical subtleties ; for niceties of
expression ; for critical propriety ; for elaborate shades of
meaning ; or for the exercise of philosophical acuteness, or
judicial research.    They are instruments of a practical nature,
founded on the common business of human life, adapted to
common wants, designed for common use, and fitted for com-
mon understandings.    The people make them ; the people
adopt them ; the people must be supposed to read them with
the help of common sense ; and cannot be presumed to admit
in them any recondite meaning, or any extraordinary gloss."
Story on the Constitution, sec. 451.

     The framers of our constitution having completed their
labors, appointed a committee of ten of their number to pre-
pare and publish an address to the people explaining the
main features of the instrument and recommending its adop-
tion.    Among other prominent persons upon that committee
were three distinguished gentlemen, learned in the law, Eben-
ezer T. Wells, William E. Beck and Wilbur F. Stone ; the
first named had for many years been a member of our terri-
torial supreme court, and all three afterwards became mem-
bers of the supreme court of the new state.    In their address
to the people this committee particularly commended the
constitution on the ground that it carefully guarded the
rights of the people against excessive taxation, public indebt-

edness, state and municipal, and all kinds of burdens which might result from a careless or reckless administration of the government by the taxing power. This court has frequently had occasion to refer to that address as an important state paper throwing light upon the meaning of the constitution as understood by its framers and the people who adopted it. *In re Lowrie*, 8 Colo. 507; *People ex rel. v. May*, 9 Colo. 88.

In that address the committee called especial attention to the fact that they had bestowed much labor with the view of securing sufficient revenue to defray the expenses of the government without imposing onerous taxation upon any class of property or industry of the state; that they had established a uniform system of taxation upon the same class of subjects; that they had adopted stringent provisions to prevent those speculations in public moneys which so often result in defalcations and loss to the people; that they had provided for a state board of equalization consisting of the highest officers of the state whose duties were to equalize and adjust the values of real and personal property for purposes of taxation, and that they had also provided for a county board of equalization for a like purpose within their respective counties; that they had prohibited the legislature from lending the credit of the state and from assuming debts or liabilities; that they had required appropriations to be kept within the limits of our resources, and had applied the same principles to counties, cities, towns and school districts, as far as possible, with the additional safeguard that to increase indebtedness in excess of the rates fixed in the constitution a vote of the people must be had thereon.

Now, if it was the understanding of the members of the convention and of their committee who thus commended their work to the people that the words " all taxes " at the beginning of section 3 of article 10 did not include assessments for benefits as well as taxes for revenue, and that there was no restriction upon the taxing power to make such assessments, then the committee should in all fairness to the people whom they addressed as well as to the convention

whom they represented, have said in their address: "Though we have provided that all taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax and have provided for a uniform valuation of your property for that purpose, nevertheless, we have left the taxing power at liberty to levy assessments for public improvements upon your property at their discretion without reference to the uniformity rule, and these assessments may be collected under special laws without reference to any just valuation of your property." If the address had contained such language it would not be difficult to conjecture what would have been the fate of the constitution in the hard times of 1876.

Five years after the adoption of the constitution the case of *Palmer v. Way* came before this court. Two of the committee who prepared and signed the address, Justices Beck and Stone, were then upon this bench presided over by Chief Justice Elbert, an able lawyer and jurist, who had been identified with Colorado, its history, its laws and public interests from its earliest organization. The court thus composed being called upon to pass upon the question of the legality of local assessments for the construction of sidewalks in the city of Denver, decided that the same could not be upheld as a valid exercise of the taxing power, because contrary to the uniformity rule prescribed by section 3 of article 10 of the constitution. It seems to me that the question of the restriction upon the taxing power by express constitutional provision could scarcely have been more directly presented for determination than in the *Parmer—Way Case*. It was not until after the validity of the assessment under the taxing power had been carefully examined, considered and expressly disapproved, that the court finally held the assessment valid as to sidewalks under the police power. The court as then constituted was not averse to sustaining public improvements; but local assessments for that purpose were considered a species of taxation, and so inhibited by the uniformity rule of the constitution, and only sustainable by the extraor-

dinary scope of the police power.  The decision in *Palmer v. Way* was approved and followed by other cases hereafter cited.

Though the majority opinion in this case is sustained by the decisions of several other states, yet it seems to me that the earlier decisions in this state are more strictly in accordance with the terms of the constitution as understood by its framers and by our people at the time of its adoption.  The constitution is strongly against excessive taxation, and strongly in favor of uniformity of taxation; it restricts legislation upon the subject of revenue appropriations and indebtedness in every direction.  The whole tone and policy of the instrument is so conservative upon the subject of finance, that it seems strange, indeed, almost impossible, that it could have been the intention of its framers to place no restriction whatever upon the taxing power in the matter of levying local assessments upon the property of our people. See constitution, particularly articles 10 and 11.

Entertaining these views I cannot accept the unqualified rule laid down by the majority of the court.  Much as I favor public improvements so far as the same can be promoted within constitutional limits and without illegal or unreasonable encroachment upon private rights, I cannot believe it was intended to place such matters within the arbitrary and unlimited power of the legislative and municipal authorities, and beyond all judicial control.  It is not to be overlooked that the former decisions of this court are supported by several well considered decisions in other states.  See *Palmer v. Way*, 6 Colo. 106, and cases there cited; *Brown v. The City of Denver*, 7 Colo. 305; *Keese v. The City of Denver*, 10 Colo. 112; *Wilson v. Chilcott*, 12 Colo. 600; *City of Chicago v. Larned*, 34 Ills. 203; *Taylor v. Chandler*, 9 Heisk, 349; *Peay v. City of Little Rock*, 32 Ark. 31; *Stinson v. Smith*, 8 Minn. 326; *Mayor of Mobile v. Dargan*, 45 Ala. 310.

2. If it be conceded that the legislature may provide for street improvements by means of local assessments upon the

abutting property, we are still confronted with the question :
How shall such assessments be apportioned?   The authori-
ties generally agree that local assessments when allowable
at all, "must have reference to the special benefits accruing
to the property by reason of the improvement—that is, ben-
efits in addition to those received by the community in gen-
eral ; and the rule must be such as will secure an assessment
in proportion to such benefits as nearly as is reasonably prac-
ticable.   Rules of apportionment according to value, area
and frontage of the property benefited have in turn been
approved and disapproved *under varying circumstances.*   Ab-
solute equality is not to be expected.   A reasonable approx-
imation thereto is all that can be required; and, when the
proper legislative body prescribes in good faith a rule by which
this may be attained with reasonable certainty, it should not be
overthrown.   When the property consists of lots of substan-
tially equal depth abutting the local improvement, and there
is nothing in the nature and circumstances of the particular
case showing that an assessment in proportion to the front-
age of the lots upon the improvement would work manifest
injustice, such a mode of assessment should be upheld."

The foregoing quotation is from the case of *The City of
Pueblo v. Robinson,* 12 Colo. 599.   In that case the validity
of an assessment for sewers was maintained as an exercise
of the police power, according to the doctrine of *Palmer v.
Way* and *Keese v. The City of Denver, supra.*   The assess-
ment was apportioned according to frontage, in pursuance
of certain ordinances of the city providing for the construc-
tion of certain sewers in a limited section of the city.   The
case was tried upon an agreed statement of facts ; and the
rule of apportionment in that particular case was sustained
on the ground that the agreed statement showed no facts
from which it could be inferred that the assessment was not
in proportion to the benefits received by the complaining
parties.   An examination of the case, however, will show
that the court was careful not to announce an unqualified or
general rule upholding assessments in proportion to frontage.

It will be observed that the statute under which the assessment in this case is sought to be maintained (Session Laws, 1889, p. 141, sec. 30) makes it imperative upon the municipal authorities to grade and pave any street or alley whenever the owners of a majority of the lots abutting upon such street or alley shall petition therefor, or whenever the board of public works shall order such grading or paving to be done; and that two thirds of the total expense of such improvements, excluding the intersections of streets ·and alleys, shall be assessed as a special tax against such abutting property to be collected with interest in the same manner as other city taxes. It is further provided that such tax shall be assessed against such abutting lots in proportion to their frontage upon the improved street respectively, the sides of corner lots to be regarded as frontage, and this without regard to the depth, value, or location of the lots, or other circumstances affecting the supposed benefit accruing to them from such street improvements. An unqualified rule like this for apportioning local assessments to pay for street improvements has been repeatedly condemned by the best judicial decisions of the country as manifestly unjust. See authorities and decisions hereafter cited.

In the heart of the city of Denver, particularly the business portion of it, where a single lot 25 feet front by 125 feet in depth is worth from $25,000 to $50,000, and where the property is, or may be made still more valuable and highly productive by suitable buildings, the cost of pavements, curbings and sidewalks is trifling in comparison with the value of the property, and in comparison with the increased value which such street improvements give to such property. But in the remoter parts of the city where perhaps the property has not a tenth or a hundredth part the frontgage value, and where expensive street improvements add but little to the actual value of the property, the cost of street improvements may be as great in proportion to the frontage as in the business center. In fact, it is not extravagant to say that while the cost of street improvements to inside property may not

exceed one per cent, or one half of one per cent, of the value of the property, yet the cost to outside property may be twenty-five or fifty per cent, or even one hundred per cent of its entire value.

There are, no doubt, many people living in their own small homes in the humbler residence portions of this city for which they are somewhat indebted, but which they are struggling to pay for. If to the already existing encumbrances upon these homes the assessments necessary to build costly street improvements be added, the owners are likely to be discouraged and overwhelmed by the debt, and thus their homes are sacrificed.

To illustrate: The record before us shows that the assessment in controversy is about $7 per front foot. Add the cost of sidewalks and other like improvements, and the total assessment would likely amount to $10 per front foot. This rate upon a pair of lots having a frontage of fifty feet would amount to $500. If the lots, being in the business center and well improved, are worth $100,000, the rate of taxation would be but five mills upon the dollar, or one half of one per cent of the full value of the property. A poor laboring man has a pair of lots of like frontage in the outskirts of the city with a little cottage thereon for himself and family where he does a little gardening, keeps poultry and other domestic animals, and by industry and close economy is able to take care of his family, and yet the whole value of his property does not exceed $1,000, and he may be in debt for half that amount. If it should suit the pleasure of the owners of a majority of the property on the street to extend costly pavements and other street improvements in front of this poor man's home (a very few wealthy people or a single individual might own a majority of the property), or if the board of public works in their discretion were to order such improvements to be thus extended, the cost of the improvements to this poor man according to his frontage would be $500, or 50 per cent of the entire value of his premises. This burden added to the existing encumbrance would al-

most inevitably result in the property passing from his hands to the hands of some one more financially favored.

It is no answer to these views to say that outside or suburban property as well as inside property will be much improved in value by expensive street improvements so long as the assessments may cause the owner to lose all he has. Many a man may be able to purchase, and by industry and economy pay for and maintain, a home when the cost is only $1,000, $2,000 or $3,000, who would be utterly unable to pay for or maintain for any length of time a home costing $5,000 or upwards. It should be the policy of our state to encourage every citizen to own his own home; and no statute authorizing street improvement to be paid for by local assessments should be so framed as to admit of the possibility of "improving" poor people out of their homes.

The foregoing is no fancy picture—no fictitious scene. Other courts have encountered just such practical difficulties as I have tried to portray, and have treated them in the plainest terms. Chief Justice Beasly of the supreme court of New Jersey speaking of a rule of apportionment almost identical with the statute under consideration says, in effect, that such legislation is not the legitimate exercise of the power of taxation. It is confiscation.

Again, Chief Justice Agnew of Pennsylvania in a case of this kind felt impelled to use the following vigorous language: "We may now travel for miles in the rural districts of large cities where broad paved and curbed streets of the most costly kinds have been paid for at private expense, under arbitrary exactions. The power has become flagrant, even engulfing the entire value of the property of small landowners. * * * If the little all of men of moderate means can be taken to gratify a taste for expensive improvements, or the mere desires of the more wealthy, or to fill the ravenous maws of contractors and public jobbers, on the pretense of public right, such persons had better flee from large towns and cities to places of safety far away from these oppressions."

Mr. Justice Carpenter speaking for the supreme court of

Connecticut of a rule of apportionment according to frontage says: "It disregards entirely the quantity of land affected. Two lots, with equal fronts, the one containing double the number of square feet contained in the other, are benefited in different degrees. The rule taxes them alike. This is not in proportion to the benefit received. * * * The rule also ignores the values of the lands benefited. Two different lots, with the same length of front, may differ greatly in value, owing to a difference in location, or other causes, and hence be benefited in different degrees. It is certainly reasonable that the one receiving the greater benefit should pay the greater tax." 2 Dillon's Mun. Corp. (4th ed.), sections 759–761; *State v. Mayor of Newark*, 37 N. J. Law, 415; *Reed v. Erie*, 79 Pa. St. 346; *Clapp v. The City of Hartford*, 35 Conn. 66; *Tidewater Co. v. Coster*, 18 N. J. Eq. 518; *Macon v. Patty*, 57 Miss. 378; *City of Chicago v. Baer*, 41 Ill. 306; *Weeks v. City of Milwaukee*, 10 Wis. 270.

The question is frequently asked: How are we going to pave our streets and beautify the city by suitable public improvements without the power to make local assessments? The question is not difficult to answer by any one who has the patience to investigate and the courage to tell the truth. It is confidently believed by well informed citizens that if all the property throughout the central portion of the city were assessed for taxation at the rate of fifty or sixty per cent of its actual cash value, instead of at fifteen or twenty per cent of such value, the revenues of the city would be sufficient during the next five years to pay for all the street improvements that will be needed for the next quarter of a century. The rule is well settled as announced by Chief Justice Beck: "Street improvements in a city are for the benefit of the public and may be paid for out of the city treasury." Such a mode of raising the revenue would cause the burden to fall upon our people according to the value of their property and could not be grievously burdensome to any class; besides, it would require no refined or strained

construction of the plain, popular meaning of the constitution in regard to the uniformity rule of taxation. I submit this in answer to the plea of necessity. Obey the constitution and faithfully administer such laws as may be enacted in pursuance thereof, and there will be no necessity or excuse for transgressing either.