[Civil No. 4525. Filed December 23, 1943.]

[145 Pac. (2d) 530.]

STATE OF ARIZONA, ex rel. Joe Conway, Attorney General of the State of Arizona, Appellant, v. SOUTHERN PACIFIC COMPANY, a Corporation, Appellee.

, Mr. Joe Conway, Attorney General, Mr. Earl Anderson, Chief Assistant Attorney General, and Mr. Charles L. Strouss, of Counsel, for Appellant.

Mr. Cleon T. Knapp, Mr. James P. Boyle, and Mr. B. G. Thompson, of Tucson, Arizona; Mr. Henley C. Booth, and Mr. Burton Mason, of San Francisco, California, for Appellee.

STANFORD, J.—This action is brought under the provisions of Section 69–119, Arizona Code Annotated, 1939 (Laws 1913, Referendum, p. 15; Sections 2166–2168, Revised Statutes of Arizona, 1913, Civil Code; Section 647, Revised Code of Arizona, 1928), being the act commonly called the Train Limit Law, and was brought for the purpose of recovering from defendant penalties as provided by the act. The charge in the complaint is that on March 12, 1940, the defendant operated a passenger train of more than 14 cars, and on April 4, 1940, the defendant operated a freight train of more than 70 cars, in violation of said law.

The aforesaid statute reads as follows:

"Section 1. It shall be unlawful for any person, firm, association, company or corporation, operating any railroad in the State of Arizona, to run, or permit to be run, over his, their, or its line or road, or any portion thereof, any train consisting of more than seventy freight, or other cars, exclusive of caboose.

"Section 2. It shall be unlawful for any person, firm, association, company or corporation, operating any railroad in the State of Arizona, to run, or permit to be run, over his, their, or its line or road, or any portion thereof, any passenger train consisting of more than fourteen cars.

"Section 3. Any person, firm, association, company or corporation, operating any railroad in the State of Arizona, who shall wilfully violate any of the provisions of this act, shall be liable to the State of Arizona for a penalty of not less than one hundred dollars, nor more than one thousand dollars, for each offense; and such penalty shall be recovered and suits therefor brought by the Attorney General, or under

his direction, in the name of the State of Arizona, in any county through which such railway may be run or operated, provided, however, that this act shall not apply in cases of engine failures between terminals.

"Section 4. All acts and parts of acts in conflict with the provisions of this act are hereby repealed."

The case was tried in Tucson, Pima County, Arizona, before the Honorable Levi S. Udall, Judge of the Superior Court of Apache County, Arizona, to whom it had been assigned.

By the judgment rendered it was held that the Train Limit Law of Arizona, as set forth in the sections above quoted, was unconstitutional and void because:

"First: Said statute invades the exclusive legislative field of Congress, as limited and defined by the Commerce Clause (par. 3, of Sec. 8, Art. 1) of the Constitution of the United States;

"Second: Said statute imposes direct, unreasonable and unlawful burdens upon, and interferes with, delays and obstructs interstate commerce, in violation of said Commerce Clause;

"Third: Said statute impairs the use and usefulness of the transportation facilities employed by defendant as a common carrier engaged in interstate commerce;

"Fourth: Said statute is in conflict with and infringes upon, and amounts to an unlawful attempt to supplement, the power-brake provisions of the Federal Safety Appliance Acts, and the safety-device provisions of Section 25 [26] of the Interstate Commerce Act, which Federal statutes operate upon the same subject matter and are directed to the same objects as said Train-Limit Law and by which said statutes Congress has completely and exclusively occupied the field of regulation of train lengths;

"Fifth: Said statute operates unreasonably and arbitrarily to deprive defendant of its property, without due process of law, in violation of both the Due-

Process Clause of the Fourteenth Amendment to the Constitution of the United States, and the Due-Process Clause set forth in Section 4 of Article 2 of the Constitution of the State of Arizona;"

Appellee has admitted the operation of the trains as alleged in the complaint, but alleged that each of said trains consisted in a large part of cars moving in Interstate Commerce and carrying interstate traffic, and in further explanation of appellee's case, we quote as follows:

" . . . and denied that either of said operations was a wilful violation of the law. For a further separate and affirmative defense to the complaint, appellee alleged that the law was and is void, invalid and unconstitutional, because in violation of the Commerce Clause (Article I, section 8, para. 3) of the Constitution of the United States, the Due-Process Clause of Section 1 of the 14th Amendment of the Constitution of the United States, and the corresponding Due-Process Clause set forth in Article II, Section 4, of the Constitution of Arizona, in that: (a) the law undertakes to regulate a subject-matter of national concern which, if required to be regulated at all, is subject to regulation only by Congress pursuant to the powers granted by the Commerce Clause; (b) the necessary effect of the law is to regulate appellee's train operations extra-territorially, that is to say, beyond the boundaries of Arizona; (c) the law directly and substantially interferes with, delays, and regulates appellee's interstate train operations in Arizona and the adjacent states; (d) the law imposes direct and substantial burdens upon the appellee's interstate train operations; (e) the law, to the extent that it has, or is intended or claimed to have, the effect of limiting the number of cars in a train to that number which can be safely and effectively controlled or stopped by the use of air brakes and other appurtenances now in use on such trains, is in conflict with and an infringement upon existing Federal legislation having the same or simi-

lar purposes, enacted by Congress pursuant to its powers under the Commerce Clause; (f) the law deprives appellee of its property unreasonably and arbitrarily, in violation of the due process clauses of the State and Federal Constitutions above referred to, for the reason, among others, that it bears no reasonable relation to health or safety, its ostensible objects, and does not eliminate or reduce any present hazard, but on the contrary creates certain hazards which would not otherwise exist, and increases other hazards of railroad operation in numerous respects.''

In 1912, the year Arizona became a state, several measures were referred, under the Constitutional Act of Initiative and Referendum to the people after their passage by the Legislature. Among those measures, besides the one in question, the Train Limit Law, each had to do with the regulation through the police power of the state of railroads in Arizona for the health and safety of its employees and traveling public. That will be observed, first, by the act regulating the number of men to be employed on trains and engines; second, by the act regulating head lights on all locomotives (for example, in this particular act, it was required that locomotive engines used in the transportation of trains over railroads should install electric head lights of a certain power); and third, by the act to require certain tests of service before a person could serve as a locomotive engineer or train conductor. It can be easily seen that all of these acts, including the one in question in this action, were made the laws of this state for the purpose of the safety and protection of employees and of the people being transported over the railroads in our state.

■ Appellee contends in its brief, as it did by a statement before the court in argument, that " . . . it is much more probable that the law was

advocated and passed as a measure to promote and preserve—make static—the employment of railroad trainmen. Certainly that is its most obvious practical (but extra-legal) purpose and, as experience has shown, one of its principal results." We have just quoted the title to other acts, as well as this one, enacted in the year 1912 by the State Legislature. All of them have to do with the regulation of the handling of trains in order to protect the employees or traveling public as will be seen by the various acts, and no other reason could possibly be assigned to those acts, including, as stated, the one in question here. The case of *State* v. *Pate,* 47 N. M. 182, 138 Pac. (2d) 1006, states: "The courts do not inquire into the motives of the legislature."

16 C. J. S., Constitutional Law, page 277, § 100, has the following to say in connection with legislative acts:

"It will be presumed that the legislature, in passing a statute, acted advisedly and with full knowledge of existing facts and conditions on which its legislation is based, and that no general laws are ever passed either through want of information on the part of the legislature or because it was misled by false representations of interested parties. It will also be presumed that the legislature carefully investigated and properly determined that the interests of the public required the enactment of particular legislation. So, the court will presume that the legislature in enacting a regulatory measure had adequate knowledge of the evils sought to be corrected and did not act arbitrarily or unreasonably."

In *State* v. *Wisconsin Telephone Co.,* 169 Wis. 198, 172 N. W. 225, 226, it is said:

"The term 'police power' is very elastic and is used to express different meanings at different times. In its broadest sense, it has been said to include 'all

legislation and almost every function of civil government.' "

The case of *Salem Lodge* v. *Swails*, 209 Ind. 347, 197 N. E. 837, 108 A. L. R. 444, expresses the opinion that when a subject lies within the police power of the state, debatable questions as to reasonableness are not for the courts, but for the Legislature, which is entitled to form its own judgment, and its action within its range of discretion cannot be set aside because compliance is burdensome.

In the case of *State* v. *Superior Court*, 103 Wash. 409, 174 Pac. 973, 976, it is stated:

"Indeed, it may be said that, where the police power is set in motion in its proper sphere, the courts have no jurisdiction to stay the arm of the legislative branch of the government, for it is operating in its own particular field, where even the courts are powerless to insist upon a procedure consistent with the forms of the common law."

Dwelling for the present on the contention of the appellee that the law is in conflict with the Fourteenth Amendment, we refer to the case of *Barbier* v. *Connolly*, 113 U. S. 27, 5 Sup. Ct. 357, 359, 28 L. Ed. 923, reading as follows:

" . . . But neither the amendment—broad and comprehensive as it is—nor any other amendment was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education and good order of the people, and to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity. From the very necessities of society, legislation of a special character, having these objects in view, must often be had in certain districts, such as for draining marshes and irrigating arid plains. Special burdens are often necessary for general benefits,— for supplying water, preventing fires, lighting dis-

tricts, cleaning streets, opening parks, and many other objects. Regulations for these purposes may press with more or less weight upon one than upon another, but they are designed, not to impose unequal or unnecessary restrictions upon any one, but to promote, with as little individual inconvenience as possible, the general good. Though, in many respects, necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. Class legislation, discriminating against some and favoring others, is prohibited; but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment.''

Appellee has brought to the attention of the court six certain cases in which it places great reliance. The first one is the case of *Atchison, T. & S. F. R. Co. et al.* v. *La Prade,* 1933, D. C., 2 Fed. Supp. 855. This case was tried by one Circuit Judge and two District Judges. In this case counsel in their brief have to say:

''The conclusions expressed by that opinion were given no effect solely because of the holding of the United States Supreme Court in *Ex parte La Prade,* 1933, 289 U. S. 444, 53 Sup. Ct. 682, 77 L. Ed. 1311, which decided that the suit had abated because of the substitution of the incoming attorney general for the original defendant. The Supreme Court considered no other question.''

The second is the *Southern Pacific Company* v. *Mashburn* (Nevada Train Limit case) 1937, D. C., 18 Fed. Supp. 393. This case was tried before one Circuit Judge and two District Judges. The case was decided against the validity of the Nevada law which was patterned after the. Arizona law.

The third case was *Texas & New Orleans R. Co.* v. *Martin et al.*, 1936, D. C. This is known as the Louisiana case and was heard by one Circuit Judge and two District Judges. It is an unreported case but the court made permanent the interlocutory injunctions issued prohibiting interference of the railroad in that state.

The fourth case is the case of *Missouri-K.-T. R. Co.* v. *Williamson*, D. C., 36 Fed. Supp. 607, known as the Oklahoma case. That case is like the Nevada Train Limit case except that it has reference to freight trains only. This case was heard and decided by the two Circuit Judges, District Judge Vaught dissenting.

The fifth case is *State, etc.*, v. *Atchison T. & S. F. R. Co. et al.*, 125 Kan. 586, 264 Pac. 1056, a Kansas case heard by the State Supreme Court. The state, through its Public Service Commission, attempted to compel, by *mandamus* proceedings, the railroad company to put into effect certain orders prescribed by it relating to manual signals to be used by train crews and relating to the air and power brake system, and in part, the holding of that state court was that such an order could not be enforced by *mandamus* where no showing was made that a better system had been devised. The unanimous judgment was rendered for the railroad company.

The sixth case is *Southern Pacific Company* v. *Railroad Commission of California*, D. C., 10 Fed. Supp. 918. In that case the Railroad Commission of California had ordered that certain trains moving between certain points during the six winter months be operated with an additional caboose, to be placed midway in the train. The opinion in this case was given by one Circuit and two District Judges upholding the railroad company.

In connection with the foregoing six cases we quote a statement, or contention, of the appellee herein as follows:

"It will be noted that the four Federal train-limit cases were heard before twelve different Federal judges, five of whom were Circuit judges and seven District judges. Three of the Circuit judges and all of the District judges, or ten Federal judges in all, have agreed that state train-limit laws exactly or essentially similar to the challenged law are invalid, upon precisely the same constitutional grounds urged in the present case. Only two of these twelve judges have taken a contrary view.

"Three of the ten Federal judges mentioned have also concurred in reaching the same result with respect to a state regulation not differing in principle from a train-limit law; although, of course, neither the volume of the traffic affected, the character and extent of the interference imposed, nor the financial burden was as severe and widespread as in the train-limit cases."

The State of Oklahoma, one of our latest additions to statehood in the Union, no doubt was desirous of enacting laws that would be progressive, that would be for the safety of the traveling public through its state and for the employees on its trains. Regardless of the reasoning of the appellee herein, as above set forth, as to the total number of various judges who have in the aggregate given opinions that would overwhelm the Oklahoma case, nevertheless the Oklahoma case was not tried by state judges and it is the latest case quoted by appellee herein, and while this court is not bound to follow, it is certainly most fitting to do so.

There are something like 325 cases cited by the two parties to this action, and it would be impossible to make reference to all of them. The case of *Missouri-K.-T. R. Co.* v. *Williamson, supra* [36 Fed.

Supp. 611], is replete with the cases cited by both sides in this case, and Circuit Judge Bratton, who wrote the opinion in that case, gave expression of the court to most all the cases cited in the case. In that case, like the one at bar, the railroad company was compelled, among other things, to expend great sums of money in order to comply with the restrictions placed by the State of Oklahoma, and by injunction the railroad company sought to be relieved of the necessity of such great additional expense. We quote from said case as follows:

"It is contended with emphasis that the statute, applied to the business of plaintiff, is not a safety measure reasonably enacted in the exertion of the police power of the state, but is merely an attempt to regulate, delay and burden interstate commerce, in violation of the Commerce Clause. The supreme, plenary and complete power of Congress to regulate interstate commerce is without limitation or restriction, except that prescribed in the Constitution; and within the reach of that paramount authority lies the power to protect such commerce against substantial dangers, burdens or obstructions, no matter the source from which the encroachment springs. *Gibbons* v. *Ogden*, 9 Wheat. 1, 6 L. Ed. 23; *Minnesota Rate Cases (Simpson* v. *Shepard)*, 230 U. S. 352, 398, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18 (citing many other cases.) Coming to apply the well recognized doctrine many state and municipal enactments have been held invalid. (citing cases).

"But every state statute having some relation to interstate commerce is not to be condemned on that ground. A state is free in the exertion of its police power to enact reasonable measures in the interest of the health, safety and welfare of its people, including employees of railroads, passengers on trains, and others, even though interstate commerce may be incidentally or indirectly involved. . . . It is crystal clear that the general principle running through

all of these cases is that a state statute, enacted in the exercise of the police power, and bearing some reasonable relation to the health, safety, or well-being of the people of the state, is not to be overturned by judicial decree, even though by its necessary operation it affects interstate commerce in an incidental or indirect manner, but not otherwise. . . .

"Plaintiff relies upon the due process clause of the Fourteenth Amendment. It is obvious that to comply with the statute ·plaintiff will be required to expend additional sums in the operation of its business. The cost of compliance with a statute of this kind is an element for appropriate consideration in determining whether the statute is arbitrary, capricious, or repugnant to due process; but, standing alone, it is not always enough to warrant judicial determination of invalidity. *Missouri Pacific Railway Co.* v. *Kansas,* 216 U. S. 262, 30 Sup. Ct. 330, 54 L. Ed. 472; *Lehigh Valley Railroad Co.* v. *Board of Public Utility Commissioners,* 278 U. S. 24, 49 Sup. Ct. 69, 73 L. Ed. 161, 62 A. L. R. 805; *Missouri Pacific Railroad Co.* v. *Norwood* [283 U. S. 249, 51 Sup. Ct. 458, 75 L. Ed. 1010] *supra.* The facts presented are not sufficient to distinguish or set apart this case from those to which reference has been made in which statutes enacted in the exercise of the police power of the state were sustained, although interstate commerce was incidentally and indirectly affected and the expenditure of additional sums was necessitated.

"The remaining contention to be considered is that the statute must fall because Congress has occupied the field; that the act infringes and is in conflict with legislation heretofore enacted by Congress pursuant to its powers under the Commerce Clause. To sustain the contention, plaintiff relies upon paragraphs 10 to 17 and paragraph 21 of section 1, and section 26, of the Interstate Commerce Act, as amended, 49 U. S. C. A. §§ 1, 26; and sections 1 and 9 of the Safety Appliance Act, as amended, 45 U. S. C. A. §§ 1, 9. Paragraph 10, section 1, of the Interstate Commerce Act, as amended,

defines the term 'car service'; paragraph 11 makes it the duty of a railroad company to furnish safe and adequate car service, and to enforce just and reasonable rules, regulations, and practices in respect of car service; paragraph 12 relates to the distribution of cars for the transportation of coal; paragraph 13 authorizes the Commission to require railroads to file with it their rules and regulations relating to car service, and empowers the Commission to direct that such rules and regulations be incorporated in the schedules showing rates, fares and charges for transportation; paragraph 14 authorizes the Commission to establish rules, regulations, and practices touching car service; paragraph 15 is addressed to the furnishing of car service and the use of facilities in case of shortage of equipment, congestion of traffic, or other emergency; paragraph 16 empowers the Commission to make just and reasonable directions in respect to the handling, routing, and movement of traffic over other lines; paragraph 17 requires railroad companies to obey orders of the Commission concerning car service, and provides a penalty for disobedience; and paragraph 21 vests in the Commission authority to require any railroad to provide itself with safe and adequate facilities for performing its car service, and fixes a penalty for refusal or neglect to comply with such an order; and section 26 authorizes the Commission to order a railroad to install automatic train-stop or train-control devices or other safety devices, and fixes a penalty for the refusal or neglect to comply with such an order. Section 1 of the Safety Appliance Act, as amended, provides that no railroad company shall use on its line any locomotive in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, and that no train shall be run in such traffic that does not have a sufficient number of cars in it equipped with such power and train brakes that the engineer on the locomotive can control its speed without requiring brakemen to use the common hand brake for that purpose; and section

9. provides that whenever a train is operated with power or train brakes not less than fifty per cent of the cars shall have their brakes used and operated by the engineer, that all power-braked cars in the train which are associated together with such fifty per cent shall have their brakes so used and operated that the Interstate Commerce Commission may, from time to time, increase the minimum percentage of cars required to be operated with power or train brakes, and that failure to comply with any such requirement shall subject the company to a penalty.

"In respect to the regulatory power of the state and the occasions for its exercise, the general subject of commerce has been divided into three separate and distinct classes. They are those in which the power of the state is exclusive, those in which the state may act in the absence of legislation by Congress, and those in which the action of Congress is exclusive and therefore the state cannot act at all. (citing cases) The reasonable limitation of the length of trains in the interest of public safety falls within the second class. As to that class, the exercise of the paramount power of Congress is necessary to take from the state its subordinate power to legislate. *Covington & Cincinnati Bridge Co.* v. *Kentucky,* [154 U. S. 204, 14 Sup. Ct. 1087, 38 L. Ed. 962] *supra; Western Union Telegraph Co.* v. *James,* [162 U. S. 650, 16 Sup. Ct. 934, 40 L. Ed. 1105] *supra.* And mere congressional delegation of power to the Interstate Commerce Commission to act in respect to that class does not require the state to yield. It is only after action by the Commission that the state is shorn of its power. (citing cases) But the intent of Congress to exert its superior authority and thus exclude or supersede state legislation concerning the same matter is not to be lightly inferred. It must be fairly manifested. (citing cases) And, it is within the power of Congress to limit its regulation to only part of a given field, thus leaving the remainder open to action by the state. (citing cases.)

"The acts of Congress relied upon fail to make specific reference to the length of trains as an element of safety, and it is not contended that the Interstate Commerce Commission has acted or asserted its authority to act in respect of the matter under the powers which Congress has delegated to it. True, some if not all of the statutes concern themselves with various aspects of safety in the operation of trains. But, fairly construed, they do not contain any provision from which it can be reasonably implied that Congress intended to exert the paramount character of its authority in relation to the length of trains in such manner as to exclude or supersede state action. And until an intent to exercise such superior authority has been indicated, the state is free to legislate in the exertion of its police power. . . . ''

It has come to our attention that the Interstate Commerce Commission in relation to the Transportation Act of 1940, 54 Stat. 898, has recently commented on that act as follows:

"It is unnecessary to decide whether Congress has occupied the field of safety regulation with respect to the operation of trains or with respect to the length of trains. In any event, that is a question for the courts. The question before us is whether, in view of the emergency found to exist, we were authorized by law to suspend the operation of State laws limiting the number of cars in a train."

The emergency referred to, of course, has reference to the suspension of the Train Limit Law for the duration of the war, and to which this state has unhesitatingly yielded.

From the case of *People* v. *Letford,* 102 Colo. 284, 79 Pac. (2d) 274, 278, we quote the following:

"In approaching the question of the validity and constitutionality of the statute, it is well to keep in mind certain fundamental rules. When an act of the Legislature is attacked on the ground of unconstitutionality, the question presented is not whether it may be voided

but whether it is possible to uphold it. *City of Denver* v. *Knowles,* 17 Colo. 204, 30 Pac. 1041, 17 L. R. A. 135. Every presumption will be indulged in favor of the legislation and only clear and demonstrable usurpation of power will authorize judicial interference with legislative action. *Green* v. *Frazier,* 253 U. S. 233, 40 Sup. Ct. 499, 64 L. Ed. 878. The rule was well stated by the Supreme Court of Massachusetts in *Re Wellington et al., Petitioners,* 16 Pick. 87, 26 Am. Dec. 631, and quoted with approval by us in *Milheim* v. *Moffat Tunnel District,* 72 Colo. 268, 273, 211 Pac. 649, 651, as follows: 'When called upon to pronounce the invalidity of an act of legislation passed with all the forms and solemnities requisite to give it the force of law, courts will approach the question with great caution, examine it in every possible aspect and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void, unless the nullity and invalidity of the act are placed, in their judgment, beyond reasonable doubt.' "

■ The trial court took from the 19th day of November to the first of the following May in the trial of this cause, excepting some recesses. There were 886 assignments of error and 39 propositions of law presented to us, and of the many scores of cases cited by both appellant and appellee, this court has read as many as possible to be consistent in rendering justice to both sides. The matter has engrossed the attention of this court, as time would permit, since its presentation in April, 1943, until this time, but the opinion, condensed as it is in the foregoing pages, expresses our reason for holding that the findings and judgment of the trial court to the effect that the Train Limit Law is unconstitutional were in error.

We cannot impugn the motives of the Legislature of our state, and in this particular case the purpose of the citizenry of our commonwealth by disturbing

the enactment of this law made by them until we find that it is in violation of a law to which the state must yield.

The judgment is reversed.

McALISTER, C. J., concurs.

ROSS, J. (dissenting).—I dissent. My reasons will be given later. Illness prevents my doing so at this time.

I think the judgment of the lower court should be affirmed.

ROSS, J. (dissenting).—When the opinion in this case was handed down on December 23, 1943, I was unable, because of illness, to give my reasons for dissenting. I now do so .

The validity of the Arizona Train Limit Law Section 69–119, Arizona Code 1939, as applied to interstate transportation of persons and property is the question for decision. Such law undertakes to penalize any railroad in the State of Arizona that runs over its lines, or any part thereof, any train consisting of more than 70 freight, or other cars, exclusive of caboose, or any passenger train of more than 14 cars.

The act is silent as to its purpose. If it was enacted to protect the safety, health and well-being of railroad employees, or the traveling public, it does not so recite, as in the *Williamson case,* 36 Fed. Supp. 607, cited in the majority opinion.

The law's observance until now by the interstate railroads operating in Arizona, as the evidence and findings conclusively show, has not only cost such utilities large sums of money but, also, has delayed and interfered with their business of transportation of goods and persons, at both the east and west boundaries of the state, without any material benefit

to the traveling public, in the way of safety or health, or of the employees unless it be that more of them thereby have secured employment, increasing the operating expenses of the roads.

One sure result of a compliance with the law has been to force interstate companies to operate many more trains in the conduct of their business than the safety and well-being of the employees would seem to require, greatly increasing their costs.

Under the law, a fruit or cattle train made up in California for the Kansas City or Chicago markets, if it consists of more than 70 cars, must, when or before it reaches Yuma, Arizona, be broken down to the limit of 70 cars before it proceeds through Arizona. When this same train has crossed Arizona it may be rebuilt to the California length and proceed on its course to the point of destination. The traffic from the east to California must also conform to this arbitrary rule at the state's boundary. In effect, the law limits length of trains from California and New Mexico to and through Arizona and practically outside of the state.

The regulation of the length of interstate trains, if permissible, is by reason of the state's right under the Constitution to pass laws for the protection of its people's lives, safety, health and well-being and to do that the state may enter the field appropriated under the Federal Constitution to the federal government, when such field has not been wholly occupied by that government. Powers belonging under the Constitution to the federal government but not exercised may in all proper cases be exercised by the state for its use and protection, and a state law to that end will be valid and enforceable.

The Train Limit Law, if an allowable state regulation originally, is no longer allowable for the following reasons:

1. The danger to life and health in the operation of long trains, because of the improvement in the operating services as shown by the evidence and findings, has been greatly minimized, if not wholly done away with.

2. That because of such improvement, if the Train Limit Law was ever a valid police regulation, it now, under the evidence, serves but one purpose, to wit, the employment of more employees and trains, with the expense and hazards incident thereto.

3. It invades the field of regulation occupied by the Congress in its legislation providing for safety appliances in railroad operations (*Virginian R. Co. v. United States*, 4 Cir., 1915, 223 Fed. 748) and the safety provisions of the Interstate Commerce Act.

4. In Ex Parte No. 156, November 8, 1943, the Interstate Commerce Commission refused to modify its Service Order No. 85, theretofore entered, suspending during the war the operation of state laws limiting the number of cars in trains, stating, among other things:

"If state laws limiting the number of cars in trains are to be held valid (a question we do not decide), it would be possible for each state to set a different number of cars as the maximum to be hauled in a train. A state might even limit the length of trains to one car, although such a law would be clearly arbitrary and unreasonable. Higher limits might be set by states and found reasonable, but lack of uniformity would place a serious burden on interstate commerce. . . .

"The fact that freight trains in excess of 70 cars and passenger trains in excess of 14 cars are safely operated in states without train-limit laws 'is convincing evidence of its safety, except where unusual operating conditions exist.' . . .

"We find that these state laws were and are in fact rules and regulations with respect to car service within the meaning of section 1, paragraph (10)

and (15); that Service Order No. 85 was and is in accord with the national transportation policy . . . and is fully authorized by section 1 . . . of the Interstate Commerce Act [49 U. S. C. A. § 1]."

The Interstate Commerce Commission refused to modify or change said Service Order No. 85 for the reasons (a) that it was a valid order made pursuant to act of Congress and (b) because as a matter of fact "freight trains in excess of 70 cars and passenger trains in excess of 14 cars are safely operated in states without train-limit laws," which " 'is convincing evidence of its safety, except where unusual operating conditions exist.' " This finding of fact by the Commerce Commission is fully and well supported by the evidence taken in this case and is in accord wth the learned trial court's findings.

Four states, Arizona, Nevada, Louisiana and Oklahoma, have enacted train limit laws. The laws in the first three named states have been passed upon and declared to be invalid (*Atchison, T. & S. F. R. Co.* v. *La Prade, D. C.*, 2 Fed. Supp. 855; *Southern Pac. Co.* v. *Mashburn, D. C.*, 18 Fed. Supp. 393; *Texas & New Orleans R. Co.* v. *Martin et al., D. C.*, 1936, No. 428–Equity) (unreported), in Oklahoma it was sustained by a divided court. *Missouri-Kansas-Texas R. Co.* v. *Williamson, D. C.*, 36 Fed. Supp. 607. The rulings of these courts is another very cogent reason why the Train Limit Law should not be sustained. These decisions were by three-judge federal courts and were unanimous in holding the law invalid, except in the state of Oklahoma. In other words, of the 12 judges presiding in these cases 10 joined in declaring the law invalid and two (in the Oklahoma case) sustained the law.

I think the judgment of the lower court should be affirmed.