## No. 13,380.

### Walker v. Bedford, State Treasurer, et al.
#### (26 P. [2d] 1051)

Decided October 18, 1933. Rehearing denied November 1, 1933.

Messrs. NORTHCUTT & NORTHCUTT, for plaintiff in error.

Mr. Paul P. Prosser, Attorney General, Mr. Norris C. Bakke, Deputy, Mr. Charles Roach, Mr. Pierpont Fuller, Jr., Mr. M. S. Ginsberg, Assistants, for defendants in error.

*En Banc.*

Mr. Justice Hilliard delivered the opinion of the court.

Plaintiff in error as plaintiff brought action to enjoin the enforcement of chapter 14, Session Laws of the Extraordinary Session of 1933. The chapter is an act entitled "An act to provide additional emergency relief funds by the imposition of additional fees upon the registration of motor vehicles, trailers and semi-trailers, during the remainder of the year 1933, and during the year 1934, and providing for the disposition of the proceeds thereof." The defendants in error are officers of the state charged by the act with the enforcement of its provisions. A demurrer to the complaint was sustained, the plaintiff elected to stand on the complaint, and judgment was entered against him. Error is assigned to the sustaining of the demurrer and the judgment.

It is alleged in the complaint that the plaintiff is the owner of an automobile, and as such required to register the same; that in compliance with law he has registered it and paid $10.05 to the proper officer and has received a license or certificate entitling him to use and operate the automobile for and during the year 1933 without further exaction except general property tax, which it is also averred has been paid; that notwithstanding, the defendants threaten to impose an additional tax of $30, and to invoke penalties unless the same be paid on or before September 1, 1933, under the provisions of the act mentioned. The plaintiff further alleges that the act contravenes, and is in conflict with, section 21, article V, section 3, article X, section 7, article X, and section 25,

article II, of the Constitution of the state of Colorado, and article V, and section 1, article XIV, of the Amendments to the Constitution of the United States.

In the view we have it will be necessary only to consider the application to the act of sections 3 and 7 of article X of the Constitution of the state of Colorado. Section 3, article X, provides: "All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws, which shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal * * *."

Section 7, article X, provides: "The general assembly shall not impose taxes for the purposes of any county, city, town or other municipal corporation, but may by law, vest in the corporate authorities thereof respectively, the power to assess and collect taxes for all purposes of such corporation."

The act recites in its first section the belief of the General Assembly that an emergency exists requiring its enactment so that funds to relieve the needy and destitute citizens of the state may be obtained. To that end, in section 2, "every owner of a motor vehicle, trailer or semi-trailer, intended to be operated upon any highway in this state * * * shall, before the same is operated, apply" for and obtain registration thereof. Section 3 provides that on or before September 1, 1933, and on or before January 31, 1934, the owner of the vehicle shall pay for its registration, "in addition to any fees required by section 42 of the Uniform Motor Vehicle Act, or any other law" and "based upon a valuation fixed by the Colorado Tax Commission * * * additional fees" upon a graduated scale, commencing with $2 on vehicles having "a certified value" not exceeding $50, and ending with $60 on vehicles valued at $5,000 and over. The Colorado tax commission is directed to certify to the motor vehicle department a list of valuations "computed in substantial conformity with the present system and practice

of the tax commission and the several county assessors in the state in assessing the value of such vehicles for tax purposes," and the motor vehicle department is directed to furnish all owners who register their vehicles "with an appropriate device to be attached to their number plates to evidence" payment, and is authorized to retain not to exceed ten cents of the amount of each registration to defray the cost of the device. Section 5 directs the "duly authorized agents of the Department," by which is meant the several county clerks, to remit to their respective county treasurers the amounts collected by them for such registrations. The second paragraph of section 5 is as follows: "All moneys so paid to the county treasurers shall be credited to a fund to be known as the 'county emergency relief fund,' and shall be expended under the direction of the board of county commissioners of each county, for work relief and direct relief to the unemployed, and for the purpose of removing destitute citizens from direct to work relief, and for no other purpose." Section 6 authorizes the motor vehicle department to make necessary rules and regulations; section 7 provides penalties for violation of the act; section 8 appropriates $500 for the expense of the commission and department in preparing, printing and delivering valuation lists to the latters' agents; and sections 9 and 10 are in the usual form of the so-called safety and emergency clauses.

Counsel in this case and in *Consolidated Motor Freight, Inc. v. Bedford,* 93 Colo. 440, 26 P. (2d) 1066, argued together, have favored us with excellent briefs of their views, and have cited cases from many jurisdictions. The answers to the questions presented are, however, we believe, largely to be found in our own reports, and we feel no need of reviewing the many authorities presented. Indeed, the varying provisions of constitutions and of statutes render such pursuit in the main an uninstructive task. General principles, largely to be de-

duced from our former decisions, should suffice, for in the last analysis the case is not a vexed one.

 ██ The principal difficulty is to determine the nature of the imposition made by the act. The General Assembly has denominated it a fee, but as has been many times held the language of the legislature is not determinative. The distinction between a property tax and an excise tax is not determined by the style of the enactments, but by the differences which exist, and when, as here, it is thought that the two nearly approach each other, they may usually be distinguished by the respective methods adopted of laying them and fixing their amount. 26 R. C. L. 35. Thus, where the tax is imposed directly by the legislature without assessment, and is measured by the extent a privilege is exercised by the taxpayer without regard to the nature or value of his assets, it is an excise; but if the tax be computed upon a valuation of property and assessed by assessors, although a privilege may be included in the valuation, it is a property tax. Id.

 It appears plain to us that the act imposes a property tax. It contains no veiled phrases that might lead one to doubt its purpose. It is a measure for revenue. No word of regulation, of license. Frankly it details a need for revenue and frankly it seeks to derive that revenue from a tax upon automobiles, assessed upon a scale of values, to be determined by a commission selected for that purpose. No other kinds of personal property are made the subject of the tax; motor vehicles alone are to bear the burden. It is true that the licensing of motor vehicles and the imposition of an excise tax in addition to the general property tax does not contravene the Constitution. *Ard v. People,* 66 Colo. 480, 182 Pac. 892. That case goes beyond the rule announced in many jurisdictions which limit excises to an amount reasonably calculated to defray the expense of licensing and regulation, but it contains language that distinguishes it from the case at bar and supports besides the position

that the act here involved cannot be upheld. At page 484 we said that "The third and last objection urged by the plaintiff in error is that 'The Motor Vehicle Act is an attempt under the police powers of the state to pass a revenue measure.' This objection cannot be sustained. A revenue measure is one which has for its object the levying of taxes in the strict sense of the words. If the principal object is another purpose, the incidental production of revenue growing out of the enforcement of the act will not make it one for raising revenue." But if the principal and only purpose of an act is to produce revenue, and the act now before us has that purpose alone, then the police power of the state fails and the constitutional inhibitions concerning uniformity are controlling. The exaction of a license fee with a view to revenue is not the exercise of the police power, but of the power of taxation. *Cooley's Constitutional Limitations* (6th Ed.) 242. The General Assembly is not at liberty to impose a property tax upon the theory that it is imposing an excise tax, for "While a license tax may be levied upon such business or occupations as are proper subjects of municipal regulation and control, and the purpose of such tax is for regulation or restraint, yet when all the elements of regulation or restraint are wanting, and the primary purpose of the act is the raising of revenue only, then it loses its character as a license tax and becomes a tax for revenue. Only those cases where regulation is the primary purpose can be specially referred to the police power." *Board of Com'rs Kiowa County v. Dunn*, 21 Colo. 185, 40 Pac. 357. So free from doubt is the matter that we are constrained to and do hold that the tax imposed by the act is a property tax. And since it is a property tax and is manifestly not "uniform upon the same class of subjects within the territorial limits of the authority levying the tax," the act must be and is held to be repugnant to section 3, article X, of the Constitution and therefore void. We do not wish it to be thought that in arriving at our conclusion we have overlooked *Denver*

*Co. v. Denver,* 21 Colo. 350, 41 Pac. 826, and *Altitude Oil Co. v. People,* 70 Colo. 452, 202 Pac. 180, for we have considered them and find them without point here. The first of those cases goes only to the proposition that under its then charter the city of Denver could lawfully levy a license tax on privileges or occupations, and that such a tax was not prohibited by section 3, article X, of the Constitution. The second case concludes that the act there under consideration was an excise tax, a decision we find no occasion to dispute.

It remains to be determined whether the act also offends against section 7, article X, upon the ground that it is an attempt by the General Assembly to impose a tax for county purposes. It seems that it does so offend. No serious question can be raised that the primary purpose of the act is to afford a fund from which the needy and destitute may receive aid, and no serious question can be raised that the duty to care for persons so afflicted rests upon the several counties. The statutory enactments upon the subject (§§7204, 8907, C. L. '21) and our judicial knowledge of the fact that that duty has always been upon the counties, makes the pronouncement certain. Hence, it follows irresistibly that the General Assembly was without power to impose the tax for the purpose it so unmistakably announced in section 5 of the act, and that having sought so to do, its enactment is void. Nor have we in this connection failed to consider *Altitude Oil Co. v. People, supra,* but again we find it pointless to this consideration. While in that case, as we have ascertained from the briefs, it was urged that an unlawful imposition had been made for county purposes, the court did not consider the problem in its opinion. In argument here it was suggested that since the fund created by that act was distributable to the counties according to their respective mileages of state routes and state highways a state and not a county purpose was involved. We need not determine that now, and since it was not determined in the Altitude Company case it may

properly remain undetermined until it comes directly before us for decision.

 The conclusion that we should be obliged to declare the act void has been reached with heavy hearts. We are far from insensible of the emergency which the General Assembly has said exists. Yet we must declare without hesitation that which our function demands. We pronounce as the most certain of law that there has never been, and can never be, an emergency confronting the state that will warrant the servants of the Constitution waiving so much as a word of its provisions. Armed men may destroy the government. Military rule, or the rule of the mob, may replace the orderly processes that have been our fortune since sovereignty was granted us by the United States. But no species of reasoning, no ingenuity of construction, no degree of emergency, can persuade us that the Constitution is without potency or dissuade us from performing our duty as its sworn officers.

Let the order be that the judgment of the trial court is reversed, with instructions to overrule the demurrer.

Mr. Chief Justice Adams, Mr. Justice Campbell and Mr. Justice Burke concur.

Mr. Justice Butler, Mr. Justice Bouck and Mr. Justice Holland dissent.

Mr. Justice Butler, dissenting.

I am of the opinion that the act of 1933 can be, and therefore should be, sustained as a valid exercise of the police power.

1. If the tax were a property tax, the act would violate section 3 of article 10 of the Constitution, which requires uniformity, and would be void. But it is an excise tax, not a property tax. While the act does not contain regulatory provisions, it repeatedly refers to and ties up with the Uniform Motor Vehicle Act of 1931, which imposes a fee for the use of the highways and concededly is a valid imposition of an excise tax. The purpose of the

act of 1933, clearly expressed, is to increase the fees required by the act of 1931; in other words, to increase an excise tax for the use of the highways, not to levy a property tax. The act expressly confines the tax to motor vehicles intended to be operated upon the highways of the state. Other motor vehicles are not affected. The acts, being in pari materia, should be construed together. The act of 1931 contains elaborate regulatory provisions, and as the act of 1933 was intended merely to supplement that act by increasing the excise tax, it was unnecessary to repeat such regulatory provisions. Construing the two acts together, they impose taxes, not upon automobiles, but upon the privilege of using the highways of the state. Such taxes unquestionably are excise taxes. In the act of 1931 the amount of the fee charged is to be determined by the weight of the vehicle and other considerations. The act of 1933 requires an added fee, the amount thereof depending upon the value of the vehicle. The fact that the amount of the charge depends upon such value does not make the act a property tax as distinguished from an excise tax. *Opinions of the Justices,* 250 Mass. 591, 148 N. E. 889; *Storaasli v. Minnesota,* 283 U. S. 57, 51 Sup. Ct. 354. In Cooley on Taxation (4th Ed.) p. 3382, it is said: "If a tax is in its nature an excise, it does not become a property tax merely because proportioned in amount to the value of the property used in connection with the occupation or act taxed." One-half of the fees paid under the act of 1931 goes to the state highway fund, to be expended under the direction of the state highway department for the construction, maintenance and improvement of the state highways, and the other half goes to the treasurers of the several counties, to be expended under the direction of the board of county commissioners for the construction, maintenance and improvement of the county roads and bridges. The additional fees paid under the act of 1933 go to the treasurers of the several counties, to be expended under the direction of the boards of county commissioners "for work relief and direct re-

lief of the unemployed, and for the purpose of removing destitute citizens from direct relief to work relief.''

It is contended that the provision just quoted indicates that the tax is a revenue tax, and that the governor's proclamation and the title to the act support the contention. Among the purposes for which the special session was called is this: ''* * * to provide funds by loan or otherwise for the financing of direct relief, or work relief, or both, during the period of the emergency.'' The title of the act is ''An act to provide additional emergency relief funds by the imposition of additional fees upon the registration of motor vehicles * * * during the remainder of the year 1933 and during the year 1934 * * *.'' Under the police power, excise taxes may be levied for the purpose of constructing, maintaining and improving the public highways. During the present unprecedented financial depression the federal and state governments have adopted vast public-works programs to relieve the distress of the unemployed. In Colorado the work relief has taken the form of the construction, maintenance and improvement of the public highways; so much so, that here ''work relief'' and ''road work'' are practically synonymous. It is altogether probable that, in providing for the use of the funds raised by the additional tax, the legislature used the words ''work relief'' as synonymous with ''road work.'' If the expenditure of the proceeds in road work is necessary to save the act from being a revenue act and therefore unconstitutional, we should assume that the legislature intended the proceeds to be so used. If words are capable of two constructions, both reasonable, one bringing a statute into harmony with the Constitution, and the other bringing the statute into conflict with the Constitution, or raising a doubt concerning its constitutionality, the courts should adopt the former construction. The construction suggested above is not strained or unreasonable and should be adopted by the court. On former occasions the court has resorted to broad, liberal construction. Take the case of *Board of*

*County Commissioners v. San Luis Valley Masonic Association,* 80 Colo. 183, 250 Pac. 147, as an example. Section 5, article 10, of the Constitution and section 7198, Compiled Laws, provide: "Lots, with the buildings thereon, *if said buildings are used* \* \* \* for *strictly* charitable purposes \* \* \* shall be exempt from taxation." After providing for this and other exemptions, the Constitution (section 6, article 10), to emphasize such limitation upon exemptions, declares that "all laws exempting from taxation, property other than that hereinbefore mentioned shall be void." The association owned a tract of land, containing 160 acres and known as Masonic Park, in Rio Grande county. On it are located three buildings; the association building, the caretaker's building and the Order of the Eastern Star building. The association leased certain lots to individual Masons for the erection of summer lodges or cottages, the association retaining "for such leasehold interest" $25 per lot. The three buildings described above, and the grounds, are used "as a fraternal, pleasure, recreation and health resort for individual Masons and their families from any part of the world, and for their recreation and health, comfort and happiness, and used exclusively for the purposes mentioned." Out of the dues, fees and donations of the members of several Masonic lodges are paid the expenses of operating and maintaining those lodges, and the remainder is used in charitable work. That work is described in the stipulation of facts, but it does not appear that such work is carried on in the association's buildings, or elsewhere, in the park. In the articles of incorporation it is said "that the business and object for which the association was formed was to promote social intercourse among themselves and associates, and to acquire, hold and convey real estate and personal property, to borrow money for the purposes of improving their property and to have and maintain in the county of Rio Grande, for the use of themselves and other associates for the purposes mentioned, an association or

club house with all the appurtenances and belongings, and matters and things of a club or association, as usual thereto." Giving a liberal construction to the foregoing provisions of the Constitution and the statute, the court held that the property is used "strictly for charitable purposes" within the spirit and meaning of the Constitution and the statute. If the court can apply such a broad and liberal, not to say generous, construction in such a case, what justification is there for resorting to a narrow, illiberal construction where, by reason of unparalleled economic conditions, the public peace, order and safety are endangered and the processes of orderly government are imperiled? Why "swallow a camel" in that case and "strain at a gnat" in this?

Regulatory excise taxes are levied, not under the taxing power, but under the police power, which, according to the highest court in the land, "is inherent in every sovereignty" (*Lake Shore & M. S. Ry. Co. v. Smith*, 173 U. S. 684, 19 Sup. Ct. 565), and "is the least limitable of the exercises of government" (*Hall v. Geiger-Jones Co.*, 242 U. S. 539, 37 Sup. Ct. 217; *Sligh v. Kirkwood*, 237 U. S. 52, 35 Sup. Ct. 501). Indeed, that great court has said that "it is elementary that the due process clause of the Fourteenth Amendment does not restrain the states in the exercise of their legitimate police power." *Pacific Gas & E. Co. v. Police Court*, 251 U. S. 22, 40 Sup. Ct. 79. And see *Barbier v. Connolly*, 113 U. S. 27, 5 Sup. Ct. 357, and *Jones v. City of Portland*, 245 U. S. 217, 38 Sup. Ct. 112.

While emergencies never justify the suspension of any of the provisions of the Constitution (Ex parte Milligan, 4 Wall. 2), they may and sometimes do justify regulations under the police power that would not be permissible in the absence of an emergency. *Wilson v. New*, 243 U. S. 332, 37 Sup. Ct. 298; *Block v. Hirsh*, 256 U. S. 135, 41 Sup. Ct. 458; *Marcus Brown Co. v. Feldman*, 256 U. S. 170, 41 Sup. Ct. 465; *Levy Leasing Co. v. Siegel*, 258 U. S. 242, 42 Sup. Ct. 289; *Chastleton Corporation*

*v. Sinclair*, 264 U. S. 543, 44 Sup. Ct. 405. The Wilson case, supra, involved the Adamson law, fixing wages to avert a strike that menaced the public health and safety. In the Block case, supra, a lease provided that at the expiration of the term the lessee would surrender possession to the lessor. After the lease in question was executed a temporary act was passed by Congress in 1919 to curb profiteering by landlords, such profiteering having grown to menacing proportions. It provided, among other things, that a tenant's right of occupancy should, at his option, continue notwithstanding the expiration of his term, subject to regulations by a commission, so long as the tenant paid the rent and performed the conditions fixed by his lease or as modified by the commission; with certain reservations not involved in the case. It was held that that provision was constitutional; that the exigency clothed the letting of the building with a public interest so great as to justify the regulation under the police power while such exigency lasted. The court remarked that, "A limit in time, to tide over a passing trouble, well may justify a law that could not be upheld as a permanent change." In the Marcus Brown case, supra, the court held that a similar statute passed in 1920 by the New York Legislature did not deprive the landlord of rights under the Fourteenth Amendment or the Contract Clause of the Constitution, although "the lease was executed before and expired soon after the date of the legislation and the landlord before the enactment had entered into a new lease with a third party to go into effect shortly after the expiration of the old one." The congressional act of 1919, involved in the Block case, supra, was continued in force by subsequent legislation until May 22, 1922, when another act attempted to continue the regulations until May 22, 1924. In the Chastleton case, supra, the court took judicial notice of the fact that the emergency no longer existed, and held, therefore, that the act was unenforceable, remarking that, "A law depending upon the existence of an emergency or other certain

state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed.''

The governor, in his proclamation, stated that ''the present nation-wide economic depression has created a serious emergency in this state due to widespread unemployment and consequent indigence and dependence of a large portion of the people of this state''; that ''the increasing inadequacy of federal, state and local relief funds to relieve the situation has resulted in existing and ever threatening deprivation of thousands of families and individuals in this state of the necessities of life''; that ''because of the conditions aforesaid, distress and hunger exist among our people in such a degree that the public peace, order, tranquillity and safety are seriously affected and endangered and the processes of orderly government itself imperiled; that * * * it is imperative that legislation be enacted immediately to allay the present widespread public discontent and social unrest; to defend the state; to relieve the needy and destitute citizens of this state from want and deprivation by the provision of direct relief or work relief, or both; to co-operate with the federal government in its program of national recovery; to prevent disaster in this critical emergency.'' Statements showing a critical emergency were made by the legislature in the act under consideration. In the Block case, supra, the court said: ''No doubt it is true that a legislative declaration of facts that are material only as the ground for enacting a rule of law, for instance, that a certain use is a public one, may not be held conclusive by the courts. * * * But a declaration by a legislature concerning public conditions that by necessity and duty it must know, is entitled at least to great respect. In this instance Congress stated a publicly notorious and almost world-wide fact. That the emergency declared by the statute did exist must be assumed, and the question is whether Congress was incompetent to meet it in the way in which it has been met by most of

the civilized countries of the world.'' Those words are applicable here.

In view of the fact that, in order to relieve the financial distress of thousands of unemployed in this state, extensive projects for the construction, maintenance and improvement of highways are contemplated; that such work will necessitate the expenditure of large amounts of money; and that motor vehicles are practically the only vehicles used upon the public highways—I do not believe that, in the absence of evidence from which unreasonableness may be inferred—and there is no such evidence—we can say that the total amount of excise taxes imposed by the two acts is an unreasonable charge for the use of the highways.

The right to impose the excise tax to raise funds for direct relief, if that means a dole, probably could not be sustained if that were the principal purpose of the act; but it is clear that the principal purpose of the act is to impose an excise tax for the use of the highways, the proceeds to be expended upon the highways, and that the provision for direct relief is merely incidental. An excise tax is not to be held void merely because it incidentally raises revenue. *Ard v. People,* 66 Colo. 480, 182 Pac. 892.

2. The act does not offend against the uniformity provision (§3, art. 10) of the Constitution. That provision does not apply to excise taxes. *Ard v. People, supra; Denver City Ry. Co. v. City of Denver,* 21 Colo. 350, 41 Pac. 826.

3. Nor does the act impose double taxation. *State v. Zimmerman,* 181 Wis. 552, 196 N. W. 848; *Alaska Consolidated Canneries v. Alaska* (C. C. A.), 16 Fed. (2d) 256.

4. The majority opinion holds that the act of 1933 imposes a direct property tax for the sole purpose of raising revenue for the support of the needy and destitute, that the duty of supporting such persons rests upon the counties, and therefore that the act violates section 7 of article 10 of the Constitution, which forbids the legisla-

ture to impose taxes "for the purposes of any county"; but, as I have shown, the act does not impose a property tax to raise revenue for that purpose, but an excise tax.

(a) In my opinion, section 7 of article 10, supra, has no application to excise taxes. For twenty years that has been the legislative construction. In the motor vehicle acts of 1913, 1919 and 1931 one-half of the net proceeds derived from the excise tax was allotted to the counties for highway purposes. During all that time the executive officers charged with the duty of enforcing those statutes gave them that construction. That is not conclusive, of course, but "the practical construction given to a statute by the public officers of the state, charged with the performance of public duties in connection therewith, is always entitled to consideration, in cases of doubt." *In re Leasing of State Lands,* 18 Colo. 359, 32 Pac. 986. This court has given an intimation with reference to the question, if it has not actually decided it. In *Altitude Oil Co. v. People,* 70 Colo. 452, 202 Pac. 180, the motor vehicle act of 1919 was challenged. One ground of objection was that the provision that 50 per cent of the net proceeds should go to the several counties, to be credited to the road fund of the counties, violated section 7, article 10, supra. The objection was presented by the assignments of error and was vigorously argued in the briefs. After holding that the tax was not a property tax, but an excise tax, we said: "Having determined that this is an excise tax, we need not consider the other constitutional questions raised, which are based upon the assumption that it is a property tax." In *City of Denver v. Knowles,* 17 Colo. 204, 30 Pac. 1041, the defendant, to defeat a statute, invoked section 7, article 10, supra, and also section 3, article 10, requiring "all taxes" to be uniform. Referring particularly to section 3, we said: "Local assessments are upheld upon the theory that the property against which the assessment is made is specially benefitted by the improvement, while taxes refer more particularly to those burdens imposed for revenue. There

is certainly reason for saying that the word 'tax,' when used in the Constitution, refers to the ordinary public taxes, and not to the assessments for benefits in the nature of local improvements." In *Milheim v. Moffat Tunnel District,* 72 Colo. 268, 211 Pac. 649, Mr. Justice Allen, in his concurring opinion, gave the above quotation from the Knowles case, and added (p. 293): "The court there applied its reasoning to section 3, of article X, which relates to uniformity of taxation, but the reasons apply as well to section 7." I concur in that statement. In *Denver City Ry. Co. v. City of Denver, supra,* referring to section 3, article 10, supra, we said (p. 353): "It seems to be almost universally accepted that this, and like constitutional provisions, refer to the levy of *ad valorem* taxes upon property, and do not apply to taxation imposed on privileges and occupations. * * * Burroughs on Taxation (sec. 54), referring to the same subject, says: 'These provisions, as a general rule, are held to apply to property alone, and not to include taxation on privileges or occupations.' "

(b) If we assume, for the purpose of the argument, that section 7, article 10, does apply to excise taxes, it does not invalidate the act of 1933, for the legislature did not levy the excise tax for county purposes. It is a matter of general notoriety that the financial distress now existing is so great and widespread that counties are wholly unable to cope with the situation, and that the relief of the poor has ceased to be a mere county matter and has become a matter of state, and even national, concern, calling for and justifying relief action by both state and nation. As we have seen, the form that work relief has taken in Colorado is principally road work, which was contemplated by the legislature in passing the act in question. That the cost of such work may be paid out of the excise taxes levied by that act has been shown in another part of this opinion.

5. When the Constitution of the United States was adopted there were those, both here and abroad—especial-

ly abroad—who prophesied an early end to the government because, it was said, written constitutions are rigid and cannot be adapted to changing conditions. But in a series of great opinions, Chief Justice Marshall, by a broad, liberal construction, demonstrated the adaptability of the Constitution to changing conditions, and thereby made it possible for the government to function and to accomplish, even in times of great emergency, the purposes for which governments are created and that alone justify their existence. History teaches us that when any government has proven unwilling or unable to accomplish those purposes, it has ceased to exist. The adaptability of the Constitution to changed conditions is what insures its continued existence. The Preamble to the federal Constitution declares that the Constitution is established to "establish justice, insure domestic tranquillity, provide for the common defense, promote the general welfare and secure the blessings of liberty to ourselves and our posterity." The Preamble to the state Constitution has a similar provision. Courts have not permitted those purposes to be defeated by narrow, illiberal construction. In *Kansas v. Colorado,* 206 U. S. 46, 27 Sup. Ct. 655, the court said: "* * * it is clear that the Constitution is not to be construed technically and narrowly as an indictment or even as a grant presumably against the interest of the grantor, and passing only that which is clearly included within its language, but as creating a system of government whose provisions are designed to make effective and operative all the governmental powers granted." In *Paddell v. New York,* 211 U. S. 446, 29 Sup. Ct. 139, the court said: "You cannot carry a Constitution out with mathematical nicety to logical extremes." And in *Re Strauss,* 197 U. S. 324, 25 Sup. Ct. 535, we find these words, referring to the Constitution: "Ordinarily words in such an instrument do not receive a narrow, contracted meaning, but are presumed to have been used in a broad sense, with a view of covering all contingencies." Such are the principles

applied in construing the Constitution of the United States, whose government possesses no powers except those granted expressly or by implication. For illustrations of the application of those principles, see *Wilson v. New* and the rent cases, supra. State governments, on the other hand, possess all the powers of sovereignty save only those that Constitutions have withheld. We should not, except in the very clearest of cases, so construe constitutional limitations as to defeat the purposes for which state governments are created, or so as unduly to cripple state governments in the performance of their functions. The Masonic Park case, supra, shows the broad, liberal construction applied by this court on one occasion. It is not necessary to resort to such extreme liberality of construction in order to uphold the act of 1933. Be that as it may, I see no reason why a narrow, illiberal construction should be resorted to where, as in this case, it results in striking down a beneficent statute enacted to meet the present emergency by relieving, to some extent, the distress that is acute, widespread, and menacing.

I believe that the judgment should be affirmed, and for the reasons stated in this opinion and in the opinions of my brothers Bouck and Holland, I respectfully dissent from the decision and opinion of the court.

Mr. Justice Bouck, dissenting.

From the opinion delivered by Mr. Justice Hilliard on behalf of the majority of the court, characterizing as unconstitutional the so-called UR Act (S. L. '33, Extraordinary Session, page 94, chapter 14), I respectfully dissent. That opinion touches—and touches but lightly—upon only two of the six contentions originally advanced by the plaintiff in error Walker, and sustains them both. It is my conviction that the decision is erroneous, not only in holding that the act violates section 3 of article X of the Colorado Constitution, which prescribes uniformity in taxation, but also in holding that it violates

section 7 of that article, which prohibits the state legislature from imposing taxes for county purposes.

1. That the act does not violate section 3 of article X of our Constitution—unless we refuse to be governed by a long line of decisions in this court—is obvious. We have repeatedly held that this section relates only to ad valorem taxes on property. In the case of *American S. & R. Co. v. People,* 34 Colo. 240, 247, 82 Pac. 531, 533, Mr. Justice Campbell, speaking for this court, said: "That provision [section 3, article X] is applicable only to a direct ad valorem tax on property, and not to a tax upon privileges or occupations. [Citing *Denver City Ry. Co. v. City of Denver,* 21 Colo. 350, 41 Pac. 826; *Parsons v. People,* 32 Colo. 221, 76 Pac. 666]." In determining the nature of the tax there involved, Mr. Justice Campbell declared: "We are clearly of the opinion that, though in form this tax is upon the capital stock, it is not a property tax, though the privilege of doing business is a property right. It is arbitrarily assessed by the legislature itself without reference to the value of the stock, or property, of the company. The capital stock is simply the standard, or measure, by which the total amount to be paid is computed, and the tax is not on the stock as property. This we think is fully sustained by the authorities. * * * We hold that the tax authorized by section 65 [S. L. '02, page 32, chapter 3], called a license tax, is, in form of an excise, a tax on the business of foreign corporations, and is levied for the purposes of state revenue." Id. 246. And, while the case was reversed by the United States Supreme Court, such reversal was on a question not involved in the present case.

This court later reaffirmed its decision as to the nature of a license tax exactly like the one involved in the American S. & R. Co. case, supra, citing the latter case with approval and saying: "It is not a property tax, but an excise tax or fee. * * * It was not intended as a property tax." *Colorado Co. v. People,* 61 Colo. 230, 232, 156 Pac. 1095, 1096.

In 1921 this court, speaking by Mr. Justice Teller, said of the gasoline tax imposed by chapter 168 of S. L. '19: "It is contended * * * that the act is void because in contravention of section 3 of article X of the Constitution, which requires that all taxes shall be uniform upon the same class of subjects, etc. This tax, it is said, is a property tax, levied without any respect to the valuation of the property and hence not uniform. * * * Considering the statute as a whole, we conclude that it imposes an excise tax, and not a property tax." *Altitude Oil Co. v. People,* 70 Colo. 452, 453, 454, 202 Pac. 180, 181. As late as 1930 this court, in opinions by Mr. Justice Campbell, has reiterated that such a tax is an excise tax. *People v. Commissioners,* 90 Colo. 592, 10 P. (2d) 1104; *People v. Denver,* 90 Colo. 598, 10 P. (2d) 1106. See also: *Ard v. People,* 66 Colo. 480, 182 Pac. 892; *Denver City v. Knowles,* 17 Colo. 204, 30 Pac. 1041.

The majority opinion paraphrases (as authority on this branch of the case) a fragmentary passage which was quoted in plaintiff in error Walker's reply brief from 26 R. C. L. 35, §19. It purports to state the rule whereby an excise tax and a property tax may be differentiated. It seems to me only fair to the editors of that work (which in 1 R. C. L., Publisher's Foreword, properly calls itself merely a "digest of particular reports" and "a rounded text which embraces, within the limits of the authorities cited, the entire field of the law") to have quoted or paraphrased also what immediately follows, dealing with the subject of excise taxes more specifically. To give but one illustration: "If a tax is in its nature an excise, it does not become a property tax because it is proportioned in amount to the value of the property used in connection with the occupation, privilege or act which is taxed." 26 R. C. L., page 35. However, it is unnecessary to canvass the pros and cons, since our decisions, including those above cited, have settled the question for this jurisdiction adversely to the contention of the plaintiff in error.

It is to be borne in mind that the state officers, defendants in error here, do not have the burden of proving that the act is valid. Our system of government places upon the plaintiff in error the absolute duty of affirmatively proving the unconstitutionality of the act beyond a reasonable doubt. This, we think, has not been done.

Unlike the national Congress (which depends upon the grant of power made in the federal Constitution), the state legislature has full and untrammeled power to pass laws, subject only to such limitations as are expressly imposed by the state and federal Constitutions. The statutes of our General Assembly are presumed to be valid. That presumption can be overthrown only when the assailant establishes beyond every reasonable doubt their invalidity.

Chief Justice Marshall, who only a few years after its adoption made of the federal Constitution a living, vitalizing thing, uttered 130 years ago a then novel doctrine: "The question, whether a law be void for its repugnancy to the Constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. * * * The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." *Fletcher v. Peck,* 6 Cranch (U. S.) 87, 128. The principle of that declaration has been well embodied in the statement "that the court usurps legislative functions when it presumes to adjudge a law void where the repugnancy between the law and Constitution is not established *beyond reasonable doubt.*" (Italics here and elsewhere are mine). 1 Tucker, Const. of the U. S. 377. The underlying principle has been repeatedly announced by this court. "The presumption is that every statute is valid and constitutional, and such presumption is to be overcome *only by clear demonstration.* In case of *doubt* every possible presumption and intendment should be made in favor of the constitutionality of the act, and it is to be overthrown only when it is clear and

unquestioned that it violates the fundamental law.'' *Consumer's League v. Colorado, etc. Co.*, 53 Colo. 54, 58, 125 Pac. 577, 578, citing numerous authorities. ''A fundamental principle of construction requires those who seek to overthrow a statute on account of its repugnance to a constitutional provision to show the unconstitutionality of the act beyond all reasonable doubt.'' *Denver City v. Knowles,* 17 Colo. 204, 211, 30 Pac. 1041, 1044. ''When an act of the legislature is attacked as in violation of the Constitution of the United States, or of the state, by a familiar rule, we are required to uphold the legislation, unless its unconstitutionality appears beyond all reasonable doubt.'' *Farmers Ind. Ditch Co. v. Agr. Ditch Co.,* 22 Colo. 513, 528, 45 Pac. 444, 450. ''Every statute is presumed to be constitutional. The courts ought not to declare one to be unconstitutional, unless it is clearly so. If there is doubt, the expressed will of the legislature should be sustained.'' *Munn v. Illinois,* 94 U. S. 113, 123.

These are the words of Chief Justice Waite: ''Every possible presumption is in favor of the validity of a statute, and this continues until the contrary is shown beyond a rational doubt. One branch of the government cannot encroach on the domain of another without danger. The safety of our institutions depends in no small degree on a strict observance of this salutary rule.'' *Sinking-Fund Cases,* 99 U. S. 700, 718.

Mr. Justice Washington voiced the rule thus: ''But if I could rest my opinion in favor of the constitutionality of the law on which the question arises, on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt.'' *Ogden v. Saunders,* 12 Wheat. 213, 270.

It therefore behooves us always to remember just where, in case a statute is questioned, the burden of proof is placed. The defender of the statute need not convince the court beyond a doubt that the statute is constitutional; he need not even supply the amount of proof (that is, the preponderance) required in ordinary civil cases. The defender is intrenched within that universally recognized presumption of validity which must be overcome by the assailant. Nor, under the authorities cited, can the assailant overcome the presumption of constitutionality by a mere preponderance; *he must prove the statute void beyond a reasonable doubt.* In criminal cases the trial judge instructs the jury that, while they are not to find the defendant guilty if they entertain a reasonable doubt of his guilt, *they are not to search for a doubt.* So in the case at bar we as a court have no right to *search* for a doubt. It is submitted that in the natural course there is a substantial and reasonable doubt as to whether the alleged conflict with section 3 of article X exists. I believe, indeed, that the lack of such conflict is plainly and affirmatively manifest.

2. Relative to the charge that there is a conflict between the act here in question and section 7 of the aforesaid article X of the Colorado Constitution, it seems clear that on this ground also the unconstitutionality of the act has not been demonstrated by the plaintiff in error Walker beyond a reasonable doubt, as the conceded rule requires it to be done. That section says: "The general assembly shall not impose taxes for the purpose of any county, city, town or other municipal corporation, but may by law, vest in the corporate authorities thereof respectively, the power to assess and collect taxes for all purposes of such corporation." The power so given the legislature to confer requisite authority upon the various local units has been generously exercised. As a result, there has existed a large measure of local self-government in this state. The board of county commissioners in each county, for example, has hitherto had—

and will continue to have—perfect control of the funds belonging to the county. No part of those funds, to be sure, can legally be raised or disbursed by the board, as such, for any other than strict county purposes, that is, for anything but "ordinary county expenses including the support of the poor and for * * * any unforeseen contingency expenses of the county" (C. L. '21, page 1841, §7204) and such other county purposes as are expressly authorized by statute.

It is not unreasonable to suppose that the UR Act will in no way interfere with the ordinary or normal functions of the counties. These will still continue under previously existing law as they were. They are not affected by any provision of the act. Those functions have been and must continue to be handled through the previously existing funds of each county. It is presumed that county commissioners and other county officers will do their duty. The act expressly erects a new fund called the "county emergency relief fund." It is not tied by the language therein to any regular county function or purpose. On the contrary, the act provides that the fund "shall be expended under the direction of the board of county commissioners," and "for work relief and direct relief to the unemployed, and for the purpose of removing destitute citizens from direct to work relief, and for no other purpose."

In our effort to ascertain the meaning of the act, we may test it and apply it in various ways. If any of its provisions will bear one construction that would vitiate it and another that would not, it is the duty of the court to adopt the latter and uphold the legislative action.

For the proper administration of governmental affairs it is not uncommon to impose new duties on existing officers outside the scope of their regular existing duties. When a statute, for instance, makes the county treasurer the ex officio treasurer of an irrigation district, he acts in the new capacity otherwise than as a county officer, and his new work is not in any true sense deemed for a

county purpose. So here under the UR Act we may and should read it so as to uphold it and not to tear it down.

In proceeding with an impartial inquiry into the situation we may properly try to picture the working of the new act in a manner free from valid constitutional objections.

The extremely grave emergency existing throughout the nation and the state is a matter of which we can well take judicial notice. Both the Governor and the legislature have solemnly recited the situation in detail. Under well recognized principles we are permitted to attach considerable weight to their declaration. That a great exigency has visited the people, lifting local problems to the level of the greatest of state and national problems, beyond the normal remedies of local self-government, must now be deemed to present a legitimate basis for laws of state-wide operation, effective for the time being as the only mode of meeting a crisis that threatens the very destruction of organized society and orderly government. The act which we are considering is by its own terms an emergency measure limited in its life to what we must presume is a reasonable period. No difference in principle can be shown between this case and the rental cases decided by the United States Supreme Court. *Block v. Hirsh,* 256 U. S. 135, 65 L. Ed. 865, 41 Sup. Ct. 458, 16 A. L. R. 165; *Marcus Brown Holding Co. v. Feldman,* 256 U. S. 170, 65 L. Ed. 877, 41 Sup. Ct. 465. No amount of discussion could add to the authority of those cases in the present plight. None will be attempted.

While section 7 of article X aforesaid probably applies only to the general taxation which comes under the statutes governing ad valorem taxes, we need not determine that question. A slight analysis of the program laid before the late special legislative session, and of the almost complete execution of that program by the legislature, shows that the UR Act does not necessarily violate the inhibition against making state laws for county pur-

poses. Attention is called to chapter 10 of S. L. '33, extraordinary session, page 68. This act directly authorizes boards of county commissioners to make bids and enter into certain contracts with the state highway department or any agency of the federal or state government "for the construction, maintenance and repair of *state or Federal* highways or bridges within their respective counties and to undertake and perform whatever work is necessary in connection therewith." This manifestly makes the board of county commissioners a state agency in disbursing the "county emergency relief fund." The legislature has imposed new duties—other than for county purposes proper—upon certain county officers. This is corroborated by the provision that "all labor employed in such contracts shall be *bona-fide residents of the state of Colorado.*"

The UR Act is not seriously attacked by counsel except for such alleged contravention of the Constitution of Colorado and the United States as would make the entire act void. The question of the partial validity and partial invalidity of statutes need therefore not be discussed in this opinion.

There have been instances—in Colorado and in sister states—where state courts have underestimated the potential liberalness and progressiveness of the United States Supreme Court in the direction of avoiding the condemnation of state statutes or even state constitutional provisions said to be in conflict with the federal Constitution. Discussion of particular cases is unnecessary to our present purpose.

As to conflict between a state law and the state constitution, on the other hand, we may recall that the federal Supreme Court will, if the state tribunal sustains the law as not in conflict with the state constitution, accept the interpretation placed by a state supreme court upon an act of the state legislature, and it will consider itself bound thereby on the issue of allegedly violating the state constitution. In the existing circumstances it would seem

that every reasonable effort should be made by this court to sustain the act in this respect.

Enough has been said above to justify our conclusion that the act contravenes neither section 3 nor section 7 of our article X. The other points have not been stressed. Nevertheless, it is proper to consider them briefly.

3. The contention that the act is a revenue measure to supply a relief or poor fund for the ordinary uses and purposes thereof must be characterized as unsound in the light of what has already been said. No one would venture to argue that the additional fees prescribed by the UR Act would be legal if it were proved beyond a reasonable doubt that they are not related to the work on the highways. Such relation is the justification for imposing the excise fees upon the motorists. A comparison of the 1931 motor vehicle act with the UR Act, considered in connection with the emergency that requires speedy employment of the unemployed on the highway system of the state, leaves us still unconvinced beyond a reasonable doubt that the act is void.

4. The alleged violation of section 21 in our article V is not shown, either beyond a reasonable doubt or otherwise. Our decided cases are sufficient to uphold the title and the subject matter.

5. It follows from what is said in the forepart of this opinion that the act does not, and could not, deprive the plaintiff in error of his property without due process of law, in violation of section 25 of article II of the Colorado Constitution.

6. As regards the alleged violation of section 1 of article V of the Amendments to the *federal* Constitution, attention is called to the fact that this section has no connection with the states, but is a limitation upon the federal government alone. Const. of the U. S. of America (Revised and Annotated), 1924, page 578. As for the Fourteenth Amendment to the *federal* Constitution, again the foregoing discussion requires the issue to be

disposed of contrary to the contention of the plaintiff in error.

New crises demand new forms and new adaptations of existing law. A statute may in form be perfect as a literary and legal production, yet utterly worthless for practical purposes. Life—national, state, local, individual—is increasingly complex. Human needs are not always best ministered unto by the simplicity of our forefathers, who dealt with the less complicated problems of their time. The world moves on, and none would wish for the return of those sterner days when the comfort of man was measured in the absence of electricity, telegraph, telephone, radio, and without railroads, automobiles, airplanes. If this court could have decided in favor of the validity of the UR Act, I feel that the court would not only have been fairly within the principles of the Constitutions of Colorado and the United States, but more in step with the march of human progress. The judgment of the lower court ought to have been affirmed.

Without qualification I approve what is said by Mr. Justice Butler and Mr. Justice Holland in their respective dissenting opinions. Certain phases of the case have been fully discussed therein, and I have purposely avoided covering the ground occupied by their arguments; but I am glad to refer to both and adopt them in their entirety.

MR. JUSTICE HOLLAND, dissenting.

I respectfully dissent from the majority opinion in this case, and specially concur in the dissenting opinions by Mr. Justice Butler and Mr. Justice Bouck. My deep concern about the possible effect of the majority opinion compels me to take an opposite view to that of my learned brethren.

Whether or not, this act of legislation, by its consequences, is just or unjust, is to be charged to the legislature. It is not for the court to decide whether this law is

needed or whether it is wise. Our duty is to determine its offense, if any, against the Constitution, and if there is a reasonable doubt about its repugnance, such doubt should be resolved in favor of the act. We are not at liberty to hold an act unconstitutional unless it is clearly so.

Considering the *expressed* need for this enactment, the apparent intention of the legislative mind, and the very words of the act itself, there is no doubt in my opinion that it is constitutional. The executive and legislative branches of our state government have declared that an emergency exists that threatens the welfare of the people as well as the public peace. The declaration to this effect by these departments is worthy of serious consideration. They ought to know.

The act here in question stands alone as an increase of the license or regulation fees prescribed in the Motor Vehicle Act of 1931, to which it refers. It is limited in time, that is, for a part of the years 1933 and 1934, after that limited period, it is inoperative, it is thereby clearly intended to meet a transient need, and such a "limit in time, * * * well may justify a law that could not be upheld as a permanent change." *Block v. Hirsh,* 256 U. S. 135, 41 Sup. Ct. 458, 65 L. Ed. 865.

I firmly believe we best uphold the Constitution, when we find that its elasticity will at least allow temporary measures to meet human needs. Such augments our pride in the fundamental law. Had our Constitution prescribed all the details or the limitations by which the government could make effective its powers for all ages to come, it would have been unwise, because the exigencies of the future are beyond human conception, and are best met when they appear, and legislation must be accommodated to circumstances. The welfare of the people of the state is really and substantially involved at this time and if that welfare is curtailed by a strict construction of this statute, the blessings of a free people are not secure.

The majority opinion disposes of this act on two findings. First: That it is a property tax. Second: That it is a levy for county purposes. I cannot agree to either. My convictions are clear, that, first: It is an increase or additional fee for registration, and as such it is an excise tax. The duration of the act is fixed, and it in no way disturbs the act of 1931, but refers to that act and clearly states that the fees now exacted are additional fees, and to be paid in the manner prescribed by that act. Is it not apparent that an increase of the fees under the 1931 act was here intended?

If an increase was so placed, the fees are directly anchored to the regulatory features of the 1931 act, and as such, come within the police power of the state as a tax for a use or privilege, and if as such, it produces revenue beyond the requirements of its enforcement or administration, intentionally or unintentionally, it is within the legislative power. *Van Hook v. City of Selma,* 70 Ala. 361, 45 Am. Rep. 85; *People v. Coleman,* 4 Cal. 46, 60 Am. Dec. 581; *Nashville, C. & St. L. R. Co. v. Alabama,* 128 U. S. 96, 9 Sup. Ct. 28; *Marmet v. State,* 45 Ohio St. 63, 12 N. E. 463.

The power to license may be exercised for regulation, revenue or prohibition. *State v. Hammond Packing Co.,* 110 La. 179, 34 So. 368; *State v. Moore,* 113 N. C. 697, 18 S. E. 342.

It is to be remembered that this act reaches only motor vehicles "intended to be operated upon any highway in this state," an explicit reference to *use,* and only those *used.* If not *used,* no fee attaches by the act. If according to the majority opinion this was a property tax, it would reach all motor vehicles regardless of use.

The license taxes on automobiles, from which almost every state derives a substantial revenue, are modern examples of this sort of tax. *Kane v. State,* 81 N. J. L. 594, 80 Atl. 453; *Ex Parte Schuler,* 167 Cal. 282, 139 Pac. 685.

It is true that the amount of the increased or additional fee required by this act is based upon valuation. No con-

stitutional objection lies in the way of a legislative body prescribing any mode of measurement to determine the amount it will charge for the privilege it bestows. *Home Ins. Co. v. New York,* 134 U. S. 594, 10 Sup. Ct. 593; *State of Maine v. Grand Trunk Ry. Co. of Canada,* 142 U. S. 217, 12 Sup. Ct. 121.

It was claimed by plaintiff in error that the act is not within the governor's call.

Section 1 of the purposes for which the general assembly was convened, contains the following clause: "To provide funds by loan or otherwise for the financing of direct relief, or work relief, or both, during the period of the emergency." By that statement, the governor indicated the general subject of the legislation. It is required that the business to be transacted at the special session shall be specially named. The above clause specifically states the nature of that particular business, and that business was to provide funds by a loan or *otherwise,* and it is not necessary that all details of proposed legislation be particularly described by the executive proclamation. The chief executive could not, with any degree of accuracy, foresee the detailed manner in which the legislative body, through its deliberations, would prescribe and enact laws to meet the general purpose of the call.

We come now to the second proposition of the majority opinion, which holds that this is an attempt by the general assembly to impose a tax for county purposes. The opinion states that, "No serious question can be raised that the primary purpose of the act is to afford a fund from which the needy and destitute may receive aid, and no serious question can be raised that the duty to care for persons so afflicted rests upon the several counties."

According to the declarations of the chief executive and the legislature, the seriousness of the situation has assumed such proportion that it has gone far beyond the ability of the several counties to meet. The very existence

of the state as a social unit is threatened and the purpose of this act is for a defense of that social unit by preserving public peace, and stands in equal position with laws enacted expressly to preserve law and order. The duty to protect its citizens is one the state can never shirk and to deny it the means, by strict construction of constitutional provisions, would be denying it its right to endure.

The word "taxes" as used in section 7, article 10, of the Constitution, refers to the ordinary public taxes. *Denver v. Knowles*, 17 Colo. 204, 30 Pac. 1041. The legislature has not attempted by this act to impose a tax for the purposes of any county. The legislature has increased its charge for a privilege, having for its main purpose in so doing, the providing of work relief. When viewed in the light of the present emergency, such would be beyond the confines of any particular county boundary. People distressed by unemployment are necessarily a restless and shifting people. Again this act is tied to the 1931 Motor Vehicle Act, in that it provides that the application for registration be made to the state department or its "duly authorized agents" as defined by the 1931 act, as the county clerk or recorder in each county. Such agents are directed by the act under consideration here to transmit all additional fees collected under this act to the county treasurer before specified dates. The act directs such county treasurers to credit the monies so paid for such fees to a fund to be known as the "county emergency relief fund." It was intended that it be expended for work relief and direct relief to the unemployed and for no other purpose, such expenditure to be under the direction of the board of county commissioners of each county.

When it is said that such is for a county purpose, the answer is here. If for county purposes, the board of county commissioners would be at liberty to expend such funds for the various uses of the county government. The fact that the fund is designated as a "county emergency

relief fund'' does not change the situation. Call it what you may for bookkeeping convenience, the fund remains the same, one to be used only for a specified purpose and if unused, is subject to the further directions of the legislature.

It has not been my intention herein to deal in detail with all of the questions involved in this case, intending only to set forth my views in a general way, since all of these questions are ably dealt with by Mr. Justice Butler and Mr. Justice Bouck in their dissenting opinions in which I most readily concur.

*On Petition for Rehearing.*

Mr. Justice Burke. It is possible that my position on one point here involved should be elucidated.

The whole people, by their Constitution, say to their legislature, You shall not impose taxes for county purposes. That is definite and final. What are county purposes? The Constitution does not say, and does not forbid the legislature to say. Hence the legislature, within all reasonable limits (of course it can not, by mere fiat, make black white), has that power. It has exercised it. An examination of its acts from territorial days discloses that it has always said that the purpose for which this statute imposes taxes (i. e. poor relief) is a county purpose. Has it now changed that declaration? On the contrary it herein reaffirms it. This act fixes the duty, imposed by it, upon the county. It limits the funds for the discharge of that duty to collections in the county. It directs the deposit of those funds in the "County Emergency Relief Fund." It directs their expenditure by the "Board of County Commissioners." It provides for no assistance to any county from without. It is therefore a legislative declaration that a function to be discharged under it is a county function and that the tax imposed by it is for county purposes.

*On Petition for Rehearing.*

Mr. Justice Bouck, dissenting.

It seems to me that the weakness of the reasoning in Mr. Justice Burke's concurring opinion, filed at the time of denial of the petition for rehearing herein, is obvious. As that weakness necessarily imparts itself to the main opinion, I then felt constrained to announce that I would add my comment upon what Mr. Justice Burke calls his elucidation. This I now do.

1. The UR tax law (S. L. '33, special session, chapter 14, page 94) was regularly passed by the general assembly and duly approved by the governor, and so, when assailed as unconstitutional, there was in its favor, under unquestioned and unquestionable principles of the courts in this country, an affirmative presumption of the law's validity, and there was concededly placed upon the assailants the affirmative burden of proving beyond a reasonable doubt that, contrary to such presumption, the act is nevertheless invalid and unconstitutional. The concurring opinion seems to overlook the presumption and the burden of proof, as well as the fundamental rule of interpretation to the effect that, where there are two possible interpretations of a particular law, one of which will uphold it, the other not, the court must adopt the one that upholds the law. As a step in the reasoning, it is said that this particular law is invalid because it undertakes to impose taxes ''for county purposes,'' contrary to the provision of the Constitution of Colorado, article X, section 7.

2. ''What are county purposes?'' asks the concurring opinion, and forthwith answers its own question by saying in effect (1) that, inasmuch as the Constitution of Colorado does not try to define ''county purposes,'' the legislature has the power to furnish the definition within reasonable limits *and (2) that it has done so.* This latter I deny. The legislature has not defined the term in the

sense of true definition, so as to mark the exact limits between what are and what are not such purposes. Nowhere in our statutes, whether state or territorial, do I find a single attempt at such demarcation. What the legislature has done in regard to counties is to establish them so that they are equipped (1) with certain inherent powers and duties which no legislature could rule to be other than necessarily for county purposes, and (2) with certain additional powers and duties which the legislature in its official discretion has seen fit to give though these, unlike the former, are not inherently or necessarily for county purposes. Of the former kind are the necessary administrative expenses of the county government, like the salaries of its officers, and expenditures for the maintenance of the county property; of the second kind are expenditures for such purposes as the building, repair, and maintenance of roads within the county, the care of paupers, or any legitimate activity which the legislature might find it expedient to assign to the county, for the convenience and general welfare of the people. Of that convenience and general welfare the legislature, and not the court, is the judge; and the legislature, which has made county purposes of certain things that are not inherently and necessarily such, may at its discretion discontinue them as county purposes, or divide them between county and state, or transfer them to the state at large. And in the last mentioned instance it may provide for agencies of the state. In so doing it may impose duties upon existing officers and require them to perform those duties wholly irrespective of their regular official labors and independent of the political subdivision which they serve. In my judgment the legislature's designation of the board of county commissioners to serve as the agent of the state under such a law as the UR act would be no less effective or unobjectionable than the frequent designation, by various statutes, of county or other officers as agents of the state or of some governmental subdivision entirely aside from their usual official

duties. An instance or two will illustrate my meaning. As I tried to point out when dissenting from the majority opinion, the office of irrigation district treasurer has been in that way superimposed upon a county treasurer (C. L. '21, page 669, §1998); but this provision does not for that reason make the district treasurership the subject of a county purpose. Nor does a provision that requires a county recorder to issue game and fish licenses, and to collect fees therefor, render his work in this connection a county purpose (C. L. '21, pages 1561, 1563, §§1540, 1548). In the present case the establishment of a special fund separate and apart from the regular county funds used for county purposes is in itself, I think, the strongest kind of argument against the position that the UR act is for a county purpose. The state highway system would have to be abolished if the same narrow construction were given our highway legislation as has been given by the majority of the court to this law. The care of the poor is no more an inherent county purpose than is the care of the roads. Mr. Justice Burke argues in the concurring opinion that, because the care of paupers has from the old territorial days been assigned to the counties, therefore the care of paupers must be considered a county purpose. One might similarly contend that, because the state highway department is spending on the roads of every county large sums collected by the state under state laws, therefore those laws are for a county purpose and unconstitutional; particularly, forsooth, by reason of the fact that, ever since the early territorial period, roads have been in the special keeping of the county, and the statutes from the beginning have provided for them as a county purpose! R. S. '68, pages 568 et seq., §§23 et seq. Compare G. L. '77, pages 794 et seq., §§23 et seq. Yet who dare so argue? To apply such artificial tests would destroy the whole fabric of our state government, as built up with the approval and consent of those who framed the very Constitution into which such new and strange meanings are

read. The analogies given will suffice to show how fallacious is the conclusion that the "tax" imposed by the UR act is for county purposes. Such has not been the interpretation given by our sister states who have like constitutional provisions. Over against this, in strong contrast, is the picture that spurred the general assembly on to what its members thought was likely to afford adequate relief.

The manhood and womanhood of Colorado in alarming numbers were, as they still are, suffering keenly from the present world-wide, and consequently state-wide, industrial depression. These are the men and women for whom the general assembly tried to supply "work relief" by the UR act. I submit that it would be unjust to call them by the dread name of "pauper," "who shall be unable to earn a livelihood in consequence of any bodily infirmity, idiocy, lunacy, *or other unavoidable cause.*" R. S. '68, page 494, §1, re-enacting "an act providing for the support of paupers," approved February 10, 1865; C. L. '21, page 2271, §8905. To say that our territorial legislature, when enacting the original pauper statute almost word for word as it stands today, visioned the possibility of such an emergency situation as now exists, and intended to rank it with the chronic causes of pauperism, which it thus expressly mentioned, is to credit that law-making body with supernatural powers of prophecy. There is an all-sufficient answer to such an argument. As a matter of common knowledge, of which this court has a right to take judicial notice, the conditions in many a county of Colorado are such that the need, among citizens of integrity and industry, is so extensive and so dire, without fault on their part, as to put it beyond the financial resources of the county to cope with the problem. The unemployed are not confined to the inhabitants of any county. They are moving from place to place. Many are marooned in the places least able to help them. In other words, the problem has as-

sumed state-wide proportions. It clamors for state-wide measures of relief.

There is another well-recognized rule of statutory interpretation that seems to have been overlooked by the concurring opinion when it implies that, to validate such a law as the UR act, there must first be a formal legislative declaration changing what has heretofore been pronounced a county purpose. The rule is this: Effect must be given by the courts as far as possible to every part of every regularly enacted statute; and, to the extent that a new statute is inconsistent with the previously existing ones, it repeals the inconsistent portions even though there is no express repeal. When the legislature, therefore, sees fit to make a law that deals with unemployment otherwise than by having the counties, as such, take care of the unemployed on the theory that they are ''paupers'' under a statute framed for normal times, the implied repeal of the older law becomes a legal and established fact, not by way of a suspicious exception, but in compliance with a general rule. I need not demonstrate the self-evident proposition that the relief for unemployment under the UR act would have been a radically different thing from our existing system of caring for paupers in the ordinary sense. The two were intended to cover distinct fields of their own, respectivly. If any inconsistencies had necessarily resulted, then under the general rule already stated, the inconsistent provisions of the old statutes would have had to yield by implied repeal.

The resulting situation is this. The main opinion overthrows the UR act, giving two reasons and only two: (1) the law violates the constitutional provision that *requires uniformity of taxation* and (2) the law violates the constitutional provision that *forbids the state to levy taxes for county purposes*. Notwithstanding the majority opinion's view which in effect proclaims the first reason to be clear as noonday, I submit that this reason is fully refuted by the three original dissenting opinions herein.

440

The second reason is attempted to be fortified by Mr. Justice Burke's brief opinion filed on petition for rehearing. The latter opinion does not mention the first reason at all. It seems to stake the entire force and validity of the decision upon a personal elucidation of the second reason alone. That the argument employed does not accomplish its evident purpose is, I think, apparent from what has been said earlier in this supplemental dissent.

Therefore I submit that the invalidity of the UR act on one or the other of the only two grounds discussed in the majority opinion has not been proved according to the admitted rule which calls for proof *beyond a reasonable doubt.* Not having been so proved, the statute ought, in my opinion, to have been upheld and the judgment affirmed. The judgment having been reversed, the petition for a rehearing ought to have been granted, and from the refusal to grant it I respectfully dissent.